# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 25, 2023        Decided March 31, 2023

No. 21-3053

UNITED STATES OF AMERICA,
APPELLEE

v.

KELVIN OTUNYO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00251-1)

*Jerome A. Madden*, appointed by the court, argued the cause and filed the briefs for appellant.

*Kevin Birney*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Christopher B. Brown*, Assistant U.S. Attorneys.

Before: RAO and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Kelvin Otunyo and his collaborators opened bank accounts for fictitious companies, deposited stolen checks into those accounts, and then cashed out. Otunyo got caught and pleaded guilty to two counts of bank fraud, one count of aggravated identity theft, and two counts of conspiracy to launder money. The district court, Howell, C.J., sentenced Otunyo to 90 months in prison. On appeal, Otunyo raises numerous legal arguments, but they all lack merit. We therefore affirm the judgment of the district court.

## I.    Background

We begin by recounting the events leading up to and including Otunyo's sentencing.

## A.   Otunyo's First Indictment

A grand jury initially returned an indictment against Otunyo for two counts of bank fraud and one count of aggravated identity theft. 18 U.S.C. §§ 1344(2), 1028A(a)(1). In the schemes alleged in the first indictment, Otunyo and his then-girlfriend defrauded two banks using the same means. Otunyo first gave his girlfriend a stolen personal identification card and a stolen social security number. He then told his girlfriend to use the stolen identity to set up corporations for fictitious companies, and to set up bank accounts for those companies. In the final step, Otunyo gave his girlfriend two stolen checks worth collectively more than $50,000. He told her to deposit the checks in the fraudulent accounts so they could get the funds.

**B. Otunyo's Debriefing Agreement**

After an extended back and forth with his attorney and the Government, Otunyo met with the Government for an interview, hoping to obtain a favorable plea bargain. In a written agreement, the Government promised that "except as provided in paragraphs two and three below, no statements made by or other information provided by [Otunyo] during the voluntary debriefing(s) will be used directly against [Otunyo] in any criminal proceeding." Paragraph two of the agreement, however, said that "the Government may make derivative use of and may pursue any investigative leads, in this or any other investigation, suggested by any statements made by, or other information provided by" Otunyo. Paragraph two further warned Otunyo that "any statements made during this debriefing are voluntarily made [by him], rather than compelled," and would, therefore, not be considered a form of "compelled" self-incrimination. For that reason, the agreement also warned that Otunyo's statements would not enjoy the protections outlined by the Supreme Court in *Kastigar v. United States*, 406 U.S. 441, 461–62 (1972) (noting that a criminal defendant "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources").

Otunyo and his attorney signed the agreement. On the signature page, Otunyo acknowledged he had "read every word" of the agreement, that his attorney had "fully explained" its terms, and that he did "understand and agree to the contents of this letter." Otunyo's attorney also acknowledged that he had "read each page of this debriefing agreement, reviewed it in its entirety with [Otunyo], and discussed fully with [Otunyo] each of the provisions of the agreement."

During the ensuing interview, Otunyo gave the Government the password to his cellphone.

## C. Otunyo's Superseding Indictment

The Government found a trove of incriminating messages on Otunyo's cellphone. A grand jury later returned a superseding indictment against Otunyo based upon this and other new evidence. The superseding indictment included the three original counts, plus two new counts for conspiracy to launder money in violation of 18 U.S.C. § 1956(h).

The two new counts for conspiracy to launder money involved three new schemes of bank fraud. The schemes of bank fraud followed a similar playbook. Otunyo and his collaborators set up fictitious companies, opened bank accounts for those companies under false pretenses, and deposited stolen checks to get the funds. Unlike the schemes alleged in the first two counts, however, the fraud schemes involved at least eight participants and more money, and the money obtained was laundered by Otunyo and his conspirators through shell companies, bank transfers, checks, and debit withdrawals. All told, these bank fraud and laundering schemes involved the theft of more than $303,000.

## D. Otunyo's Request for a Hearing Under *Kastigar*

Otunyo claims the Government used his disclosure of the password to unlock his cellphone and find the incriminating messages that led to the superseding indictment, worsening his legal predicament.[1]

---

[1] The district court credited the Government's evidence that the FBI cracked the password before the meeting. We do not rely upon this evidence.

Through a new court-appointed attorney, Otunyo requested an evidentiary hearing under *Kastigar* and the dismissal of the superseding indictment as a violation of his privilege against self-incrimination protected by the Fifth Amendment to the Constitution of the United States. Otunyo alleged he did not know the Government could make derivative use of his words, including using his revealed password to unlock his cell phone. Otunyo alleged he had instead understood he would have complete or "transactional" immunity for anything he said during the interview.

After hearing testimony from several witnesses, including Otunyo and his former attorney, the district court denied Otunyo's motion. The court found Otunyo's "bald assertions" incredible. As the court explained, Otunyo's former attorney had testified that he discussed the agreement several times with Otunyo before the meeting, and that he had specifically explained the limited scope of the immunity afforded by the agreement. The testimony also showed the Government had explained the entire agreement during the meeting before Otunyo signed it. The Government had explained the scope of the promised immunity to Otunyo with a vivid example: If, during the meeting, Otunyo confessed he had killed someone and buried the body in his backyard, then the Government would not be able to use Otunyo's confession directly against him in a criminal proceeding. On the other hand, the Government would be able to search Otunyo's backyard for evidence of a dead body and a shovel with his fingerprints. It could then use the dead body and shovel as evidence against him in a criminal proceeding. Otunyo said he remembered a story about a dead body and a shovel. Otunyo's attorney corroborated the story.

Based upon this record evidence, and considering Otunyo's education and sophistication, the district court found that Otunyo's assertion was "belied by the hearing record."

### E. Otunyo's Plea of Guilty and Sentencing

Otunyo eventually pleaded guilty to all five counts of the superseding indictment, without a plea agreement.

The district court later held a lengthy sentencing hearing. When calculating the recommended sentencing range under the Guidelines, the district court began by grouping the counts of bank fraud and the counts of money laundering. Specifically, the court grouped the counts of bank fraud and the counts of money laundering into two separate subgroups under § 3D1.2(d) of the Guidelines, and then grouped all counts together into a single group under "3D1.2(c) as involving substantially the same harm."[2] Because the district court grouped the four counts under § 3D1.2(c), it had to determine Otunyo's offense level based upon the "most serious" subgroup included in the group—i.e., the conduct involved in the counts of money laundering. U.S.S.G. § 3D1.3(a).

As required by § 3D1.3(a), the district court applied the specific offense guideline for the counts of money laundering.

---

[2] In response to questions raised by this court at oral argument, the Government stated the counts should not have been grouped under paragraph (c). Oral Argument at 17:12–20:21. We have no occasion to decide this forfeited issue. The Government made no objection to the grouping decision when asked by the district court, never cross-appealed, and never raised the error in its brief. The error, if anything, would redound to the benefit of Otunyo, as it excludes offense conduct for the counts of bank fraud, U.S.S.G. § 3D1.3(a), so he suffers no prejudice. We therefore assume, without deciding, that the court properly grouped the counts under paragraph (c).

*See id.* § 2S1.1. In order to establish the base offense level for money laundering, however, the court first had to apply the guideline for "the underlying offense from which the laundered funds were derived." *Id.* § 2S1.1(a)(1). Money laundering always involves an underlying predicate crime, and this cross-reference recognizes that the underlying criminal conduct remains blameworthy even when it is not charged. The laundered funds in this case were derived from bank fraud, so the district court applied the guideline for bank fraud. *Id.* § 2B1.1.

After applying the guideline for bank fraud and determining the base offense level for money laundering, the district court applied two enhancements, adjusted the offense level upward based upon Otunyo's aggravating role as a supervisor and downward based upon his acceptance of responsibility, and ultimately calculated a recommended range of 70 to 87 months incarceration for Otunyo's criminal history category of II, as detailed in this table:

| Guideline 2S1.1 | Type | Offense Level |
|---|---|---|
| 2B1.1(a)(1) | Base offense level for bank fraud | 7 |
| 2B1.1(b)(1)(G) | More than $250k fraud enhancement | +12 |
| 2B1.1(b)(10)(c) | Sophisticated fraud | +2 |
| **2S1.1(a)(1)** | **Base offense level for laundering** | **21** |
| 2S1.1(b)(2)(B) | 18 U.S.C § 1956 conviction (conspiracy to launder money) | +2 |
| 2S1.1(b)(3) | Sophisticated laundering | +2 |
| 3B1.1(b) | Manager/Supervisor adjustment | +3 |

| 3E1.1(a) | Acceptance adjustment | -2 |
|---|---|---|
| **Total (Range)** | | **26 (70-87 months)** |

Having determined the recommended sentencing range under the Guidelines, the district court sentenced Otunyo. The court chose as a starting point the middle of the range, 78 months. It then granted Otunyo two downward departures: a six-month downward departure to account for Otunyo's mandatory post-incarceration deportation from the United States as a criminal alien, *see United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994), and another six-month downward departure to account for conditions of confinement during the Covid-19 pandemic. The district court also considered—and rejected—Otunyo's request for a variance to address an alleged "unwarranted sentencing disparity," referring to the sentence given to another defendant. The district court ultimately sentenced Otunyo to 66 months in prison for his bank fraud and money laundering offenses, which was below the range recommended in the Guidelines. After adding the mandatory consecutive two-year sentence for his aggravated identity theft, the district court sentenced Otunyo to 90 months in prison.

## II. Analysis

Otunyo raises many arguments on appeal. We have considered them all, and we reject them all, but we address only those that warrant treatment in a published opinion.

### A. Otunyo Voluntarily Disclosed His Cellphone Password

Under *Kastigar v. United States*, a witness compelled to testify in exchange for immunity who is later indicted may "shift to the government the heavy burden of proving that all

of the evidence it proposes to use was derived from legitimate independent sources." 406 U.S. at 461–62. The Government will attempt to meet that burden in a so-called "*Kastigar* hearing."

*Kastigar* does not help Otunyo "for the simple reason that the government did not compel him to provide any incriminating information; he did so voluntarily pursuant to the debriefing agreement." *In re Sealed Case*, 686 F.3d 799, 801 (2012). "The debriefing agreement alone determines the scope of [Otunyo's] immunity, and its terms are clear." *Id.* at 802 (citation omitted). Otunyo's agreement allowed the Government to use his voluntary disclosure of his cellphone password to find evidence against him. "Therefore, the government did not need an independent source for the information it used to draft charges against [Otunyo], and the district court did not err when it failed to convene a hearing on the matter." *Id.*

Otunyo argues his disclosure was compelled because he misunderstood the promised immunity. He asserts he had "knowingly" to agree to the terms of the proffer letter in order voluntarily to forego the privilege. He appears to assume the standard governing the waiver of the privilege in a suspect's unwarned custodial interrogation or a defendant's plea of guilty applies here. *See, respectively, Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Brady v. United States*, 397 U.S. 742, 748 (1970). Like Otunyo, the district court assumed this standard governed.

We are not so sure. As a general rule, "it is settled that forfeiture of the privilege against self-incrimination need not be knowing." *Salinas v. Texas*, 570 U.S. 178, 190 (2013) (plurality opinion). "Almost without exception, the requirement of a knowing and intelligent waiver has been

applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973). One exception to this rule, recognized in *Miranda*, applies to a criminal suspect's "unwarned custodial interrogation," and is justified by the "uniquely coercive nature" of this kind of setting. *Salinas*, 570 U.S. at 184. A voluntary interview coming after an arraignment informing a defendant of his right to remain silent, *see* Fed. R. Crim. P. 5(d)(1)(E), negotiated by counsel, and preceded by a written warning that statements would be voluntary and therefore not subject to the protections of the privilege against self-incrimination, seems far removed from the coercive "unwarned custodial interrogation" at issue in *Miranda*. *Id.* Moreover, requiring knowledge of the terms of an agreement in this setting would invite frequent "oath-swearing battles," with the attendant costs in the form of drawn-out evidentiary hearings and delays.

Nonetheless, we have not received adequate briefing on this issue from the parties, and we need not address it now. For even if the Fifth Amendment required that Otunyo understand the immunity promised by the Government, that standard was satisfied here. No evidence other than Otunyo's testimony lends support to his alleged misunderstanding of the agreement, and the district court found that Otunyo's testimony was not credible. We review that credibility finding for clear error. *United States v. Cunningham*, 145 F.3d 1385, 1392 (D.C. Cir. 1998). Under this standard of review, a factual "finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017).

The finding of the district court is certainly "plausible." The agreement Otunyo signed is clear. Although the legal nuances may be difficult for an unaided layman to grasp,

Otunyo acknowledged that his attorney explained the terms of the agreement, and that he understood it. The hearing testimony is consistent with that. Otunyo's former attorney and a government attorney had each explained the scope of the promised immunity to Otunyo before and during the meeting. Otunyo recalled the vivid story about a dead body and a shovel. Otunyo spoke English well and was educated and savvy. Otunyo also dissembled about other matters, implying that the Government had promised him a visa in exchange for attending the meeting, only to walk that back on the stand lest the court find he was "lying." In short, the agreement and parol evidence plausibly show that Otunyo understood the agreement. That finding of fact governs this appeal. We are therefore compelled to hold, and confidently do hold, that Otunyo understood the scope of his immunity and gave up his password voluntarily.

## B. The District Court Got the Advisory Sentencing Range Right

Otunyo objects on a number of grounds to the recommended sentencing range determined by the district court. We have considered Otunyo's numerous objections, and we reject them all, but we discuss only three.

### 1. The base offense level for the underlying bank fraud was seven

The base offense level for Otunyo's money laundering counts is "[t]he offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). Otunyo derived the laundered funds from acts of bank fraud. The district court, therefore, had to determine the offense level for the conduct of bank fraud that was the source of the laundered funds.

The guideline applicable to bank fraud, § 2B1.1, provides:

(a) Base Offense Level:

> (1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

> (2) 6, otherwise.

According to the district court, "the plain text of the guideline dictates that the defendant's base offense level should be 7, not 6." Otunyo nonetheless argues the base offense level for his conduct of bank fraud should be six. We interpret the text of the guideline de novo. *United States v. Day*, 524 F.3d 1361, 1374 (D.C. Cir. 2008).

We agree with the district court. Otunyo's two convictions for bank fraud fit squarely under the text of paragraph (a)(1). Bank fraud (A) is "referenced to this guideline," *see* U.S.S.G. § 2B1.1 cmt. n.2(A) & app. A, and (B) has a maximum term of imprisonment of more than 20 years. 18 U.S.C. § 1344. Otunyo "was convicted of an offense of" bank fraud so, per paragraph (a)(1), his base offense level is seven.

Otunyo makes a convoluted argument to the contrary, relying upon the grouping rules, the commentary, and unpublished dispositions from other circuits. In short, Otunyo argues that because the district court was determining the offense level for the "most serious" offenses—the two counts of money laundering—the court had to ignore Otunyo's separate convictions for bank fraud. As Otunyo puts it, the district court had to focus only upon "the 'offense of conviction,'" which he understands as a term of art that means

only the "most serious" money laundering offenses that dictate the offense level under the Guidelines. U.S.S.G. § 3D1.3(a).

A close reading reveals the flaw in Otunyo's argument. The text does not say "the" offense of conviction, as he puts it. It says "an" offense of conviction. This small textual difference matters. "The chief grammatical function of *an* is in contrast with *the*. It connotes a thing not previously noted or recognized; *the* connotes a thing previously noted or recognized." Webster's New Universal Unabridged Dictionary 63 (2nd ed. 1983). The use of the indefinite article "an" does not refer a reader back to the definite money laundering counts that are the "most serious" within a group. Rather, "an" is best read to mean "any one." *Id.* The guideline therefore tells a district court that, if (1) "any one" of the defendant's convictions is governed by § 2B1.1 and (2) that offense carries a maximum term of 20 or more years, then the base offense is seven.

### 2. The district court did not double-count Otunyo's sophisticated conduct

The district court applied an enhancement to Otunyo's underlying acts of bank fraud because his conduct "involved sophisticated means and [Otunyo] intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C); *see also id.* § 2B1.1 cmt. 9(B) (defining sophisticated means). The district applied another enhancement because Otunyo was convicted of a conspiracy to launder money and "the offense involved sophisticated laundering." *Id.* § 2S1.1(b)(3); *see also id.* § 2S1.1 cmt. 5(A) (defining sophisticated laundering). On appeal, relying upon commentary to the guideline for money laundering, Otunyo argues the district court double-counted sophisticated conduct.

14

The commentary provides:

> **Non-Applicability of Enhancement.** If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, [then] do not apply subsection (b)(3).

*Id.* § 2S1.1 cmt. n.5(B). The commentary modestly clarifies the scope of the enhancement for sophisticated laundering: For the enhancement to apply, the conduct must involve at least some sophisticated laundering. It is not enough that a defendant engaged in sophisticated criminal acts to obtain control of the proceeds. For example, if a defendant sells drugs using a highly sophisticated network of front businesses but engages in no other "complex or intricate" efforts on the back end to conceal the unlawful origin of the drug sale proceeds, *id.* § 2S1.1 cmt. 5(A), then the enhancement for sophisticated laundering does not apply.

The question, then, is whether "the only conduct that form[ed] the basis for" the enhancement was the sophisticated bank fraud. It was not. Otunyo's money laundering involved separate "complex and intricate" means of concealing the funds, including fictitious entities, shell corporations, and several levels of transactions or "layering." As the district court explained, Otunyo "used separate fraudulent bank accounts to remove the funds stolen through the check fraud scheme by drawing checks on the first fraudulent account into which the stolen funds were originally deposited, made payable to a second fraudulent bank account." One scheme alone involved two fictitious entities used to launder the proceeds as a payment for a car bought at auction and a payment to a petroleum company. Otunyo may have engaged in even more

sophisticated acts of bank fraud, but that is not the test. The test is whether "the only conduct that forms the basis" for the enhancement is the same as the sophisticated conduct in the bank fraud. That test is not met here because at least some of Otunyo's laundering conduct was also "complex and intricate." We therefore reject this argument.

### 3. Otunyo was a supervisor

Otunyo next argues the district court erred when applying an upward adjustment for Otunyo's aggravating role as a "manager or supervisor." U.S.S.G. § 3B1.1(b). That guideline provides:

> If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

Otunyo has conceded the money laundering involved five or more participants. In fact, it involved at least eight participants. The only question is whether the district erred in concluding Otunyo was a "manager or supervisor," a question we review with "due deference." *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014).

Ordinarily, we would have no difficulty upholding the conclusion of the district court. The record is replete with evidence of Otunyo's role as a supervisor. We have previously held that similar decision-making authority and control over other members of a check fraud conspiracy earns a middle-rung enhancement as a supervisor. *Id.* at 991–92. In the parlance of check fraud, Otunyo recruited, trained, and directed "runners" to cash checks and register dummy corporations. *Id.* at 991. "[A]lthough [Otunyo] was not the kingpin, he was also not

merely a runner but instead at least a manager or supervisor." *Id.*

As Otunyo points out for the first time on appeal, however, the commentary in the guideline for money laundering limits the scope of the supervisory activity that may be considered when applying the adjustment. The commentary provides:

> Notwithstanding §1B1.5(c), in cases in which subsection (a)(1) applies [as it does here], application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (*i.e.*, the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived.

U.S.S.G § 2S1.1 cmt. n.2(C). As the Third Circuit has explained in plain English, this commentary

> directs that adjustments contained in Chapter 3 are to be applied based on the money laundering behavior alone, not on the underlying offense from which the laundered funds were derived. In other words, the [management or supervision] has to be manifested in how the money is laundered, not in how the money was gained.

*United States v. Capps*, 977 F.3d 250, 255 (3d Cir. 2020). The district court, therefore, had to decide whether Otunyo was a manager or supervisor of the activity based solely upon his role in supervising "the laundering of criminally derived funds." U.S.S.G. § 2S1.1 cmt. n.2(C).

Otunyo argues the district court overlooked this commentary, failed to separate the relevant conduct, and erroneously applied an adjustment based upon Otunyo's role in supervising "the conduct of the bank fraud scheme," not the

laundering scheme. Otunyo never raised this argument before the district court. We therefore review for plain error. Fed. R. Crim. P. 52(b).

Several circuits have already held that a failure to adhere to this commentary when applying an adjustment amounts to plain error. *See Capps*, 977 F.3d at 257 ("Given the text of Commentary Note 2(c), we think the error is plain."); *United States v. Arellanes-Portillo*, 34 F.4th 1132, 1140 (10th Cir. 2022) (same); *United States v. del Carpio Frescas*, 932 F.3d 324, 332–33 (5th Cir. 2019) (same); *see also United States v. Salgado*, 745 F.3d 1135, 1138–39 (11th Cir. 2014) (concluding there was error on de novo review).

For our part, we have held an error is obvious enough if it runs afoul of a clear legal norm, such as the text of a Sentencing Commission policy statement or the clear text of a guideline. *United States v. Long*, 997 F.3d 342, 357 (D.C. Cir. 2021); *United States v. Brown*, 892 F.3d 385, 400 (D.C. Cir. 2018). This case is not so straightforward, however. The commentary is clear, but unlike the text of a guideline, the commentary is not a binding legal norm, and we do not defer to the commentary if it is "inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Section 1B1.5(c), moreover, says that a Chapter 3 adjustment is applied to the underlying offense conduct "except as otherwise expressly provided." One would think an express exception should prominently appear in the text of the guideline, not in an easily overlooked commentary note. Reasonable jurists may question why overlooking an exception that appears only in the commentary should be considered "obvious" error. *See del Carpio Frescas*, 932 F.3d at 342 (Oldham, J., concurring) ("Does this strike *anyone* as plain and obvious?").

We need not, and do not, decide whether there was error, or whether the error was obvious enough to be plain. The Government argues that "even if the district court should have only looked at the money-laundering activity, there still was ample evidence to support the enhancement." We take this to mean the alleged error does not affect "substantial rights" because the record shows that Otunyo was in fact a supervisor of the money laundering. Fed. R. Crim. P. 52(b); *see also Greer v. United States*, 141 S. Ct. 2090, 2098 (2021) ("[A]n appellate court conducting plain-error review may consider the entire record—not just the record from the particular proceeding where the error occurred.").

In order to show the error affected his substantial rights on plain error review, Otunyo must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). He has not made this showing. Otunyo gave several supervising instructions to "Co-Conspirator F." We find at least three telling examples of supervision that together compel an adjustment.

First, during one scheme, Otunyo told Co-Conspirator F to launder funds by sending a $16,500 check for an "Auction car payment" from a fraudulent account to a fictitious company created by Otunyo. Second, during this same scheme, Otunyo messaged Co-Conspirator F a fake identity so the co-conspirator could establish a personal bank account to launder funds. Third, Otunyo instructed Co-Conspirator F to launder funds by making withdrawals and debit transactions. These instructions are compelling evidence that Otunyo supervised the money laundering. He was in charge of the runners in the scheme not just when they carried out the check fraud, but also when they concealed the proceeds of the fraud. Otunyo,

therefore, fails to show a reasonable probability of a different outcome.

## C. Otunyo's Sentence Was Reasonable

Otunyo argues his sentence was unreasonably long. He compares his sentence to the sentence of Michael Afram Orji, a fraudster with whom Otunyo had previously worked. The comparison is an odd one because Orji received a ten-year prison sentence for bank fraud and money laundering, almost double the sentence the district court imposed upon Otunyo. Otunyo complains the district court gave Orji two variances it did not give to him. By failing to give him the same variances, Otunyo argues, the district court did not give enough weight to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Our "review of criminal sentences for substantive reasonableness is quite deferential. It will be the unusual case when an appeals court can plausibly say that a sentence is so unreasonably high or low as to constitute an abuse of discretion." *United States v. Knight*, 824 F.3d 1105, 1110–11 (D.C. Cir. 2016) (quotation marks omitted). We presume a sentence within the range recommended by the Guidelines is not excessive, and the district court in this case started in the middle of the recommended range and then granted two downward departures. *United States v. Law*, 806 F.3d 1103, 1106 (D.C. Cir. 2015). Our presumption is especially relevant when a defendant alleges an unwarranted disparity, as "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). "The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and

offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

Otunyo fails to show any abuse of discretion. To begin, any comparison between himself and Orji is inapt. Orji had a far more extensive criminal history, so he does not have a "similar record[]." Orji also engaged in more egregious criminal conduct, so he was not found guilty of "similar conduct." Because Orji was far more culpable and therefore faced a longer sentence, the district court reasonably found the comparison inapt.

Otunyo seems to think the difference in culpability should cut in his favor, not against him. He complains that, in giving Orji a variance, the district court gave weight to Orji's speedy decision to plead guilty and cooperate, and claims this in effect punished Otunyo for being adversarial and therefore violates his due process rights. Far from showing the disparity was "unwarranted" or unconstitutional, this shows only that Otunyo and Orji were not similarly situated, and therefore the disparity in their treatment was warranted. *Bartlett*, 567 F.3d at 908–09.

"[I]t is not forbidden to extend a proper degree of leniency in return for guilty pleas." *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978). "The whole notion of showing leniency to some deserving defendants–that is, of treating them more mildly than others–requires withholding leniency from others who appear less deserving." *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993). It is not unconstitutional, for example, for a judge to show less leniency to a defendant who acknowledges guilt only after conviction than to "an otherwise identical defendant who showed greater acceptance of responsibility by acknowledging his guilt at an earlier stage." *Id.* at 1477; *see also United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013) ("That some defendants pled guilty while

others did not provides a perfectly valid basis for a sentencing disparity, and such disparity imposed no impermissible burden on [the defendant's] jury-trial right." (footnote omitted)). We think it is equally lawful for a court to give a downward variance to a more cooperative defendant while denying the variance to a more litigious defendant. Otunyo is not entitled to benefit because someone else was more cooperative.

Otunyo's argument also fails for a second, more basic reason. Section 3553(a)(6) is focused solely upon "*sentence* disparities." This tells the court to evaluate the difference in the outcome (the sentence), not differences in the sentencing process.

### III. Conclusion

In sum, we reject all of Otunyo's arguments. The judgment of the district court is, therefore,

*Affirmed*.