# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 18, 2023       Decided January 5, 2024

No. 23-3023

UNITED STATES OF AMERICA,
APPELLEE

v.

RUSSELL DEAN ALFORD,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00263-1)

---

*Deanna Lee Oswald*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs were *Kevin L. Butler,* Federal Public Defender, Northern District of Alabama, and *Tobie J. Smith*, Appellate Attorney.

*Eric Hansford*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Michael Romano*, Assistant U.S. Attorneys.

Before: HENDERSON and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: A jury convicted Russell Alford of four misdemeanors stemming from his role in the U.S. Capitol protest on January 6th, 2021, for which he received a sentence of twelve months' incarceration. He appeals to challenge the reasonableness of his sentence and the sufficiency of the evidence to support two of his convictions, both of which charged him with engaging in "disorderly or disruptive conduct." The trial evidence indicated that, during Alford's brief time within the Capitol, he was neither violent nor destructive. Nevertheless, we affirm his convictions because a jury could rationally find that his unauthorized presence in the Capitol as part of an unruly mob contributed to the disruption of the Congress's electoral certification and jeopardized public safety. We likewise affirm Alford's sentence. The district court acted within its discretion in imposing a within-Guidelines sentence after weighing the competing circumstances.

## I.
### A.

On January 6, 2021, the Congress and Vice President Mike Pence met to certify the winner of the 2020 presidential election pursuant to the Electoral Count Act, 3 U.S.C. §§ 1–22.[1] The Capitol was closed to the public and the U.S. Capitol Police formed a security perimeter around the building consisting of interlocking bicycle racks and mesh fencing. Signs posted around the perimeter read "Area Closed."

That afternoon, however, a mob broke through the perimeter, tore down the barricades and clashed with police.

---

[1] We draw the following description of the facts from the trial record.

Members of the mob entered the Capitol through broken windows and then threw open the doors to their compatriots. Ultimately, the mob delayed the electoral certification by several hours. Both the Senate and the House recessed shortly after 2:00 p.m. and did not resume until 8:00 p.m. that night after law enforcement secured the building.

Alford was among those who entered the Capitol. He and a friend traveled from Hokes Bluff, Alabama, to attend the rally that President Donald Trump held on the morning of the 6th. Alford remained at the rally through President Trump's speech and then followed the crowd moving toward the Capitol. As he neared the building, he walked past "Area Closed" signs and overturned barricades into the restricted area.

Shortly after 2:00 p.m., Alford reached the Capitol near the Upper House Door, which is reserved for the use of Congress members only. He stood nearby as more than twenty police officers worked to secure the steps leading up to the door. He then moved further around the building and watched events unfold outside a different door for approximately half an hour before returning to the Upper House Door.

When Alford returned to the Upper House Door, there were no longer police present. He climbed the steps as other rioters knocked on the doors to attract the attention of rioters already inside the building, who then threw open one of the double doors that make up the Upper House Door. This triggered a shrill, continuous security alarm that sounded throughout Alford's time in the building. Alford paused outside to upload a photo of the rioters to social media that he captioned "Patriots," and then walked into the Capitol. Dozens of others streamed in before and after him.

Alford remained inside the Capitol for approximately thirteen minutes. As he entered, he turned and unsuccessfully

attempted to open the other double door. He then walked further into the Capitol through a metal detector, setting off its alarm. While inside, he mostly stood to the side and observed. He filmed protestors chanting "stop the steal" and pounding on a door that led to the floor of the House, behind which sheltered dozens of Congress members.

Police arrived within about ten minutes of Alford's entry and began physically and verbally directing the crowd back out through the Upper House Door. Alford initially moved further down the hallway before turning and making for the exit. Only one of the double doors was open and Alford stepped to the side by the closed door as others filed out past him. Alford remained there for about two minutes filming the departing crowd with his phone, watching as roughly fifty people exited through the open door next to him. He left once someone managed to open the second double door.

**B.**

Alford was charged with four misdemeanors: entering or remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in the Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four). He exercised his right to a jury trial and was ultimately convicted on all counts.

As relevant here, Alford moved for a judgment of acquittal on Counts Two and Three, contending that there was insufficient evidence to prove that he had engaged in "disorderly or disruptive conduct." The district court denied the motion, reasoning that "Mr. Alford's mere presence inside the

Capitol disturbed the public peace or undermined public safety" and that "his presence was an aspect of the disorder and disruption of the Capitol." Trial Transcript at 747:16–17, 748:8–9, *United States v. Alford*, No. 21-cr-0263. It sentenced Alford to serve the statutory maximum for each count concurrently, resulting in a sentence of twelve months' imprisonment followed by twelve months' supervised release.

## II.

Alford raises two issues in this appeal: the sufficiency of the evidence to support his convictions on Counts Two and Three and the substantive reasonableness of his sentence. We review the district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Sitzmann*, 893 F.3d 811, 821 (D.C. Cir. 2018). In so doing, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We must respect "the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999) (quotation omitted).

We review the substantive reasonableness of Alford's sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Our review is "quite deferential," meaning that it is an "'unusual case'" in which the district court abuses its discretion. *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016) (quotation omitted). Moreover, where, as here, the sentence falls within the range of the Sentencing Guidelines, we "appl[y] a presumption of reasonableness." *United States v. Parks*, 995 F.3d 241, 248 (D.C. Cir. 2021).

**III.**

Alford contests whether there was sufficient evidence for the jury to convict him of violating 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D). The former prescribes up to one year of incarceration for whoever

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions.

18 U.S.C. §§ 1752(a)(2), (b)(2). The Capitol qualified as a "restricted building" on January 6th because Vice President Pence was present to oversee the electoral certification. *See id.* § 1752(c)(1)(B) (defining "restricted building or grounds" as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting").

The second statute is specific to the Capitol. It provides that

> [a]n individual or a group of individuals may not willfully and knowingly . . . utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

40 U.S.C. § 5104(e)(2)(D). A violation is punishable by up to six months' incarceration. *Id.* § 5109(b).

For both convictions, the issue is whether a jury could conclude that Alford's conduct, which was neither violent nor destructive, was "disorderly or disruptive." Alford contends that these statutes reach only conduct that is inherently disruptive or disorderly, unlike his assertedly quiet and brief foray into the Capitol. We disagree. We first discuss the proper scope of "disorderly or disruptive conduct" before explaining why Alford's narrow interpretation is mistaken. Finally, we address why a rational jury could conclude that Alford's conduct was disorderly, disruptive or both.

**A.**

"In addressing a question of statutory interpretation, we begin with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quotation omitted). We give words their plain, everyday meaning unless the Congress "employs a term of art," in which case "'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)).

"Disorderly conduct" is one such term of art. It is the modern successor to the common-law offense of breach of the peace and so it carries that history with it. *See* 3 J. Ohlin, Wharton's Criminal Law § 37.2, at 139 (16th ed. 2021) ("Most states have replaced the common-law offense of breach of the peace with the offense called disorderly conduct."); 2 Model Penal Code and Commentaries § 250.2 cmt. 1, at 325 (1980) (recognizing breach of the peace as the "analogous offense" at common law of disorderly conduct). Black's Law Dictionary gives its definition as "[b]ehavior that tends to disturb the

public peace, offend public morals, or undermine safety" and provides a cross-reference to "Breach of the Peace." *Disorderly Conduct*, Black's Law Dictionary 292 (7th ed. 1999) (listed under "Conduct").[2] "Breach of the Peace," in turn, is defined as "[t]he criminal offense of creating a public disturbance or engaging in disorderly conduct, particularly by an unnecessary or distracting noise." *Id.* at 182; *see also United States v. Elmore*, 108 F.3d 23, 25 (3d Cir. 1997) (recognizing the definition of disorderly conduct from Black's as "adequate . . . for purposes of federal law").[3] The offense of disorderly conduct traditionally extends not only to acts that would constitute a breach of the peace at common law "but also [to] conduct tending to corrupt morals, to endanger health or safety, or simply to annoy other members of the community." 2 Model Penal Code § 250.2 cmt. 1, at 325; *see also* 27 C.J.S. *Disorderly Conduct* § 2 (Aug. 2023 Update) (recognizing that "[t]he term 'disorderly conduct' is a broader term than 'breach of the peace'").

These definitions are nebulous but time has given them concrete contours in two ways important here. First, it is well-established that whether conduct qualifies as disorderly depends on the surrounding circumstances. Courts consistently observe that "whether a given act provokes a breach of the peace depends upon the accompanying circumstances," making it "essential that the setting be considered." *United States v. Woodard*, 376 F.2d 136, 141 (7th Cir. 1967); *see also*

---

[2] Another treatise defines "disorderly conduct" as "any words or acts which tend to disturb the peace or endanger the morals, safety, or health of the community, or of a class of persons." 27 C.J.S. *Disorderly Conduct* § 2 (Aug. 2023 Update).

[3] Other authorities have similarly interpreted "breach of the peace" as "a crime defined to include any behavior that disturbed or tended to disturb the tranquility of the citizenry." 2 Model Penal Code § 250.2 cmt. 1, at 325.

9

*Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993) ("Whether particular conduct is disorderly therefore depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the surrounding circumstances."). Legal treatises agree. 27 C.J.S. *Disorderly Conduct* § 2. And the Supreme Court has taken the same approach, focusing its interpretation of a state's breach-of-the-peace provision on the defendants' conduct "in the circumstances of these cases." *See Garner v. Louisiana*, 368 U.S. 157, 174 (1961).

This circumstances-sensitive approach tracks common sense. A lone hiker on a mountaintop can sing at the top of his lungs without disturbing a soul; a patron in a library cannot. It is entirely appropriate to clap and cheer when a keynote speaker steps to the podium but to do so once the room has fallen quiet and he has begun to speak would ordinarily be disruptive. Thus, in determining whether an act is disorderly, the act cannot be divorced from the circumstances in which it takes place.

Second, it is equally clear from caselaw that even passive, quiet and nonviolent conduct can be disorderly. The Supreme Court has recognized that a breach of the peace can occur "by passive conduct likely to cause a public disturbance," *Garner*, 368 U.S. at 173–74, and we have likewise observed that "[p]eople blocking traffic at a critical intersection may breach the peace as fully as those who hurl stones," *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 116 (D.C. Cir. 1977). In fact, disorderly conduct statutes typically encompass "obstructing a lawful assembly or meeting" and "congregating with others in a public place and refusing an official order to disperse," both of which can be done peacefully and passively. 3 Wharton's Criminal Law § 37.2, at 143–44 (footnotes omitted). A sit-in protest, for instance, may impede the

operations of the targeted organization as effectively as a vandal.

In sum, we think the Congress intended to incorporate these principles when it criminalized "disorderly conduct." Accordingly, we need not delineate the outer boundaries of its definition to conclude that it extends at least this far: conduct is disorderly if, viewed in the circumstances in which it takes place, it is likely to endanger public safety or create a public disturbance.

Unlike disorderly conduct, "disruptive conduct" is not a term of art and has only its plain meaning. When the two provisions here were enacted in 1967 and 1971,[4] the adjective "disruptive" carried the same familiar meaning that it does today: "causing or tending to cause disruption." 1 Webster's Third New Int'l Dictionary 656 (1966). And "disrupt" meant "to throw into disorder or turmoil" or "to interrupt to the extent of stopping, preventing normal continuance of, or destroying." *Id.*; *see also* Webster's Ninth New Collegiate Dictionary 366 (1984) (defining "disrupt" as "to throw into disorder" or "to interrupt the normal course or unity of").

Whether particular conduct is disruptive is also a context-sensitive inquiry. The Supreme Court has observed that whether conduct "disrupts or is about to disrupt normal school activities" should be made "on an individualized basis, given the particular fact situation." *See Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972). Similarly, in interpretating a statute that prohibited making "a harangue or oration" in the Supreme Court, we concluded that the statute's focus was on actions "that tend to disrupt the Court's operations." *United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017). Our analysis

---

[4] *See* Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 275, 276 (1967); Pub. L. No. 91-644, § 18, 84 Stat. 1880, 1891–92 (1971).

reasoned that disruptive actions are those that are inappropriate or plainly out of place for the time or setting. *See id.* For instance, we explained that neither a lawyer making an oral argument nor a tour guide's presentation to tourists would qualify as disruptive because each is an accepted part of the High Court's operation. *Id.* But we held that it was disruptive for members of the audience during oral argument to interrupt the proceedings with speeches and singing. *Id.* at 1104–05, 1111. Our *Bronstein* holding demonstrates that the everyday meaning of "disruptive" centers on an action's tendency, taken in context, to interfere with or inhibit usual proceedings.

**B.**

Alford argues that "disorderly or disruptive conduct" must be given a far more restrictive scope. He contends that the statutes reach only "inherently disorderly or disruptive conduct" and thus his mere presence in the Capitol on January 6th cannot qualify. Appellant's Opening Br. 29. He suggests that this interpretation is required to avoid reading the two adjectives out of the statute. He observes that § 1752(a)(2) already requires the disruptive or disorderly conduct to "in fact, impede[] or disrupt[] the orderly conduct of Government business" and so it would be redundant to interpret the *actus reus* of "disorderly or disruptive conduct" as focusing on the *effect* of the conduct rather than the *nature* of the conduct independent of its effect.

This argument is misplaced for several reasons. To begin with, almost no conduct is always and innately disruptive or disorderly. Even the most quintessentially disruptive acts, ones involving violence and loud noises, are appropriate in some circumstances. Screaming is not disruptive at a football game. Punching is not disruptive in a boxing ring. Even discharging a firearm in a courthouse is not disruptive if done by a security

officer to protect the court. *See Bronstein*, 849 F.3d at 1109. Alford provides no touchstone for determining when conduct is *inherently* disruptive or disorderly.

Nor is it apparent that focusing on the likely effect of an action yields surplusage in § 1752(a)(2), as Alford contends. An action can have a disruptive effect and yet not succeed in hindering a governmental proceeding. For instance, someone clicking a pen repeatedly during a Senate hearing may be acting disruptively, but if the hearing nonetheless proceeds smoothly, the clicking will not have "in fact, impede[ed] or disrupt[ed] the orderly conduct of Government business." In that scenario, § 1752(a)(2)'s *actus reus* and its harm element both carry independent meaning even without restricting the *actus reus* to inherently disruptive conduct.

Finally, to the extent that the statutory elements do overlap to some degree, we note that the canon against surplusage is only a presumption, one that can be overcome by other interpretive considerations. *See Bronstein*, 849 F.3d at 1110. As discussed, "disorderly conduct" is best understood as a term of art and courts consistently look to circumstances to determine what is disorderly. The Congress uses such terms intending to adopt their traditional meaning. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word."). To allow a presumption against superfluity to displace the most natural reading of the text would be inappropriate here.

Alford puts forward one other textual argument for narrowing the scope of "disorderly or disruptive conduct" but it is also unconvincing. Turning to the text of § 5104(e)(2)(D),

he argues that because the statute prohibits "utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct," the canons of *ejusdem generis* and *noscitur a sociis* require limiting "disorderly or disruptive conduct" to actions similar to the specified prohibitions. Neither canon has application here, however. *Ejusdem generis* is the principle that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quotation omitted). It typically involves the use of a catchall phrase after a list of specific terms, *see id.* at 223–24, but here there is nothing of the kind. The conjunction "or" separating the statute's two prohibitions shows that they are not connected. Each stands alone with its own verb and its own objects.

Nor does *noscitur a sociis*—a word is known by the company it keeps—apply here. This canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (quotation omitted). But for the canon to apply, the group of words must share "a relevant common attribute," *Ali*, 552 U.S. at 225, or "a common feature to extrapolate," *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 380 (2006). No such common attribute or feature exists here. The statute simply puts two different prohibitions side by side without providing the context clues needed to link one to the other substantively. *See id.* at 379 (rejecting the argument that, without more, "pairing a broad statutory term with a narrow one shrinks the broad one").

14

## C.

We must decide whether any rational jury could have found that Alford's conduct on January 6th was "disorderly or disruptive." Under a proper understanding of those terms, as discussed above, the answer is yes to both.

A rational jury could conclude that Alford's actions were disruptive because his presence in the Capitol contributed to the Congress's multi-hour delay in completing the electoral certification. There was ample evidence for the jury to conclude that Alford knowingly entered the Capitol without authorization: he walked past numerous "Area Closed" signs, stood by as rioters in the building threw open the non-public Upper House Door, walked into the Capitol despite a shrill security alarm and then passed through a metal detector without undergoing any security screening. A police officer testified at trial that each unauthorized individual posed a security hazard and that the Congress could not resume its business until the entire building was cleared and checked for threats like lurkers or explosives. Alford's entry into the Capitol—alongside dozens of others—directly contributed to the Congress's need to recess to ensure the safety of its members. Indeed, entering the Capitol as part of a crowd rather than as a lone individual magnified the disruptiveness of his presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work.

For similar reasons, a rational jury could conclude that Alford's actions were disorderly because, viewed in the context of the day's events, they "tend[ed] to disturb the public peace, offend public morals, or undermine safety." *See* Black's Law Dictionary at 292. As discussed, Alford's unauthorized

presence in the Capitol as part of large and unruly group jeopardized the safety of the Congress as well as the police on the scene. It is also clear that the rioters created a widespread public disturbance. Alford played a part in that by adding to the crowd and by attempting to open the closed half of the door through which he entered the Capitol to allow more people inside.

Alford paints himself as a passive observer, and, granted, his conduct does not rise to the level of culpability of many of his compatriots. But he made a deliberate choice to join the crowd and enter the Capitol when he was plainly not permitted to do so. The jury was not required to view Alford's actions in isolation as though he were the only one at the Capitol that day. It was entitled to interpret Alford's actions in light of the circumstances. Those circumstances manifest that there was sufficient evidence to support the jury's verdict.

## IV.

Alford also argues that the district court abused its discretion in sentencing him to twelve months' imprisonment. He contends that his sentence is disproportionate to the sentences of other January 6th misdemeanants, who typically accepted plea deals and received sentences that ranged from probation to a few weeks' imprisonment. *See* 18 U.S.C. § 3553(a)(6) (instructing district courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). His sentence, he argues, is more in line with those of defendants convicted of felonies and he attributes the disparity to the fact that he exercised his right to trial and to the poor fit between the "letter" of the Sentencing Guidelines and his actual conduct.

Alford fails to meet the high bar to show an abuse of discretion. To begin with, he concedes that his sentence falls

within the Guidelines' recommended range of ten to sixteen months. His within-Guidelines sentence is accordingly entitled to a "presumption of reasonableness," meaning that it "will almost never be reversed on appeal as substantively unreasonable." *United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008). This is particularly true if the defendant "alleges an unwarranted [sentencing] disparity" because the Guidelines are designed precisely to prevent disparity. *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023). Thus, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *Id.* (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).

Moreover, there are material differences between Alford's situation and the January 6th misdemeanants who received lesser sentences. Alford's decision to exercise his right to trial meant that he did not receive a sentencing reduction for acceptance of responsibility, as he likely would have had he pleaded guilty. *See* U.S.S.G. § 3E1.1(a) (providing a two-level sentencing reduction if the defendant "clearly demonstrates acceptance of responsibility for his offense"); *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc) ("The Guidelines explicitly tell judges that they normally should deny the two-point reduction to a defendant who does not plead guilty."). Alford was entitled to put the government to its burden of proof, but electing to do so meant foregoing benefits that other defendants obtained by striking plea bargains. *See United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013) ("That some defendants pled guilty while others did not provides a perfectly valid basis for a sentencing disparity."); *see also United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (affirming a sentence as reasonable where the disparity in sentences between two co-defendants was "entirely explained" by one defendant receiving an

"acceptance-of-responsibility reduction for his having pleaded guilty").

Alford also received a sentencing enhancement because he provided misleading testimony at trial. The district court found that his testimony, although falling short of "deliberate falsehoods," was nonetheless "disingenuous" and "not . . . entirely candid" or "truthful." Sentencing Transcript at 38:24–39:4, *Alford*, No. 21-cr-0263. Alford "mischaracterized some of [his] actions and motivations" in order to downplay his culpability.[5] *Id.* at 38:1–2. Accordingly, he received a two-level sentencing enhancement because he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. Alford conceded below that the enhancement was proper and he does not contest its application on appeal. It was not unreasonable for the district court to conclude that Alford warranted a sentence greater than other January 6th misdemeanants because he was ineligible for the acceptance-of-responsibility reduction and brought upon himself the penalty of a two-level enhancement through his testimony.[6]

---

[5] For instance, Alford testified that he traveled to Washington D.C. to "enjoy [himself], take some pictures, enjoy some like-minded people." Trial Transcript at 806:3–4, *Alford*, No. 21-cr-0263. He also claimed not to notice the signs and barricades restricting access to the Capitol and claimed not to know that he was not allowed inside. *Id.* at 807:9–808:14, 849:13–15. And he stated that, once in the Capitol, he was just "being a sightseer in D.C." *Id.* at 821:22.

[6] For this reason, we see no indication (contrary to Alford's suggestion) that the district court punished Alford for exercising his right to a jury trial. The district court expressly stated that it was "not

And even if there were some degree of sentencing disparity, that is only one factor among many that district courts must balance when sentencing. Section 3553 instructs district courts to consider, for example, the circumstances of the offense, the characteristics of the defendant, the seriousness of the offense, the need for deterrence and the protection of the public. *See* 18 U.S.C. § 3553(a). These factors are "vague, open-ended, and conflicting," which is why their balancing is left firmly to the discretion of the district court. *Gardellini*, 545 F.3d at 1093. Here, the district court conscientiously addressed the § 3553 factors and weighed several in Alford's favor. The court credited Alford's lack of a criminal history and the fact that he was neither violent nor destructive. But it also noted indicators of Alford's lack of remorse and the need for further deterrence. This balancing of competing considerations is consistent with our "narrow and deferential" review in this area. *See id.* at 1090.

In short, we cannot say that the district court's sentence, which was not only within the Guidelines but on the lower end of the range, constituted an abuse of discretion. To warrant reversal, the district court must clearly overstep its bounds. It did not do so here. *See Gall*, 552 U.S. at 51 ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.").

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered*.

---

going to penalize" Alford for going to trial. Sentencing Transcript at 42:1, *Alford*, No. 21-cr-0263.