# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 12, 2024          Decided January 17, 2025

No. 23-3074

UNITED STATES OF AMERICA,
APPELLEE

v.

JEFFREY SCOTT BROWN,
APPELLANT

Consolidated with 23-3075, 23-3104

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cr-00178-1)
(No. 1:21-cr-00178-2)
(No. 1:21-cr-00178-3)

*Jerome A. Madden*, appointed by the court, argued the cause and filed the briefs for appellant Jeffrey S. Brown.

*Dennis E. Boyle* argued the cause and filed the briefs for appellant Peter J. Schwartz.

*Benjamin Schiffelbein*, Assistant Federal Public Defender, argued the cause and filed the brief for appellant Markus Maly.

*Peter F. Andrews*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Matthew M. Graves*, U.S. Attorney, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant U.S. Attorneys.

Before: MILLETT and GARCIA, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Jeffrey Brown, Markus Maly, and Peter Schwartz were tried and convicted by a jury for assaulting police officers on the Capitol grounds on January 6, 2021. All three now challenge their convictions, and Brown also challenges his sentence. We affirm Brown's and Maly's convictions and Brown's sentence. Per the parties' stipulation, we vacate Schwartz's conviction on the 18 U.S.C. § 1512(c)(2) charge. Lastly, we hold that, in compelling Schwartz to unlock his cellphone, law enforcement violated the Fifth Amendment, and so we remand Schwartz's judgment to the district court to determine which, if any, of his counts of conviction must be vacated in light of that error.

**I**

**A**

Jeffrey Brown, Markus Maly, and Peter Schwartz did not know each other prior to January 6, 2021. They travelled to Washington, D.C. separately from their homes in California (Brown), Virginia (Maly), and Pennsylvania (Schwartz) to

attend then-President Trump's "Stop the Steal" rally at the Ellipse. After former President Trump's speech, they each made their own way to the Capitol grounds.

Trial evidence showed that Maly and Schwartz assaulted law enforcement officers at two locations on the Capitol grounds. The first was the Lower West Terrace. By around 2:00 that afternoon, police had formed a line on the terrace to try and halt the rioters and were using bike racks as a make-shift barrier. Over the next half hour, the rioters became "more and more aggressive" and began removing the bike racks. J.A. 1435.

Around 2:30, the line of officers began to "collaps[e]" and, at that moment, a rioter located in the same area where Schwartz was standing threw a folding chair at the officers, striking one of them on the head. J.A. 1439. That officer testified that he did not see who threw the chair, J.A. 1485–1488, but Schwartz wrote in a text message on January 7, 2021: "I threw the first chair at the cops after they maced us." J.A. 2020.

Shortly after that, Schwartz twice fired pepper spray at police officers on the Lower West Terrace. The evidence also showed Maly firing pepper spray at officers on the Terrace.

The violence then moved to the inauguration stage on the West Front of the Capitol Building. Behind the center of the stage, the Lower West Terrace door led to the lower Crypt of the Capitol. The door was set back eight to ten feet from the building's façade, creating a "portico area" that, after January 6th, was commonly referred to as the "[T]unnel." J.A. 970. After rioters overcame officers' defenses in other parts of the Capitol exterior, police retreated to the Tunnel and formed a line to protect the Lower West Terrace door. Over the course of several hours, rioters repeatedly tried to push through the

door, at times "rush[ing] the door" and forming a "crush" against the line of police. J.A. 1011–1012, 1201. At some point, the confrontation "broke out into full fighting"—"hand-to-hand combat"—and rioters were attacking officers with baseball bats, flagpoles, sticks, chairs, "pretty much anything that you can think of[.]" J.A. 1585. Officers later testified that their time in the Tunnel was "pretty terrifying[,]" J.A. 1205, and described it as "hell[,]" J.A. 1585. One recounted that the "tunnel was by far [his] worst experience" on January 6th. J.A. 1380.

By shortly after 3:00, Schwartz, Maly, and Brown had each entered the Tunnel. Standing a few feet from the line of police officers, Schwartz handed a canister of chemical spray to Maly, who then passed it to Brown. After Brown appeared to have trouble releasing the spray, he handed the canister back to Schwartz, who adjusted something on the canister. Schwartz passed the canister back to Brown, who then sprayed the line of officers from close range.

Maly soon left the Tunnel. After Brown sprayed the officers, Brown, Schwartz, and other rioters attempted to use their weight to push through the officers, chanting "[h]eave-ho." J.A. 1845–1846, 2048.

**B**

A grand jury subsequently indicted Brown, Maly, and Schwartz as follows:

(1) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1), (b) against Schwartz for throwing a chair at officers;

(2) Civil Disorder, 18 U.S.C. § 231(a)(3), against Brown, Maly, and Schwartz;

(3) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1), (b) against Schwartz for his first use of pepper spray;

(4) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1), (b) against Schwartz for his second use of pepper spray;

(5) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1), (b) against Maly for his use of pepper spray;

(6) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, 18 U.S.C. §§ 111(a)(1), (b) & 2 against Brown, Maly, and Schwartz for their use of pepper spray in the Tunnel;

(7) Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) & 2, against Schwartz;

(8) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1), (b)(1)(A), against Brown, Maly, and Schwartz;

(9) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2), (b)(1)(A), against Brown, Maly, and Schwartz;

(10) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4), (b)(1)(A), against Brown, Maly, and Schwartz;

(11) Disorderly Conduct in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(D), against Brown, Maly, and Schwartz; and

(12) Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F), against Brown, Maly, and Schwartz.

J.A. 2–7.

Brown, Maly, and Schwartz exercised their right to a trial. Before trial, Schwartz filed motions, as relevant here: (1) to suppress evidence obtained from his cellphone because FBI agents forced him to unlock it with his thumbprint in violation of the Fourth and Fifth Amendments; and (2) to sever the trials under Federal Rule of Criminal Procedure 8(b).

The district court denied both motions. As for the Fifth Amendment claim, the court found that the FBI had compelled Schwartz to unlock his cellphone, but determined that act was not testimonial and therefore did not give rise to a Fifth Amendment violation. The court also found that the good faith exception made suppression inappropriate in any event.

With respect to the motion to sever, the district court held that the defendants were properly joined because of their alleged coordinated conduct in the Tunnel—namely, passing a canister of pepper spray among themselves. The court reasoned that Schwartz, Brown, and Maly were "alleged to

have participated in 'the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.'" J.A. 281 (quoting FED. R. CRIM. P. 8(b)).

The defendants were tried before a jury in November 2022. At the close of the government's case, each appellant moved for acquittal under Federal Rule of Criminal Procedure 29. Schwartz and Maly moved generally for acquittal, and Brown moved specifically for acquittal based on the "deadly or dangerous [weapon] enhancement" applied to him under 18 U.S.C. §§ 111(b) and 1752(b)(1)(A) in four counts.

The district court denied those motions, reasoning that the government had presented evidence that each defendant fired pepper spray on January 6th and that, based on the evidence in this case, a reasonable jury could find their use of pepper spray constituted use of a deadly or dangerous weapon.

Maly also requested a specific unanimity instruction for the 18 U.S.C. § 111 counts, which the district court denied. The court held that a specific unanimity instruction is not required when, as with Section 111, a statute lists alternative means of committing a single offense.

The jury convicted Schwartz, Brown, and Maly on all counts. The district court then sentenced Schwartz to 170 months of imprisonment, Maly to 72 months, and Brown to 54 months.

**II**

The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

8

**III**

Schwartz, Brown, and Maly all argue that there was insufficient evidence to convict them under 18 U.S.C. §§ 111(b) and 1752(b)(1)(a) for using pepper spray on the ground that it is not a deadly or dangerous weapon. Schwartz claims the same is true for the chair he threw at officers. Schwartz separately argues that the compelled opening of his cellphone violated the Fifth Amendment, and so evidence obtained from the phone should have been suppressed. Schwartz also argues that the defendants' cases should have been severed. Maly, for his part, maintains that he was entitled to a special unanimity jury instruction on the Section 111 counts. And Brown contends the district court abused its discretion in sentencing him to a prison term of 54 months. Lastly, Schwartz argues that his conviction under 18 U.S.C. § 1512(c)(2) should be vacated, and the government agrees in light of *Fischer v. United States*, 603 U.S. 480 (2024). Gov't Br. 15 n.4.

We vacate Schwartz's Section 1512(c) conviction and remand for resentencing because, with that conviction vacated, Schwartz's sentence was based on an incorrect Guidelines range. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016).

We also agree with Schwartz that the government violated the Fifth Amendment when it compelled him to open his cellphone, and so we remand for the district court to determine whether that error was harmless or whether it infected some or all of Schwartz's offenses of conviction. We deny the rest of the claims raised on appeal.

9

**A**

We turn first to Schwartz, Brown, and Maly's joint argument that there was insufficient evidence to convict them of using a dangerous weapon—pepper spray and, for Schwartz, a chair—while attacking police officers, in violation of 18 U.S.C. §§ 111(b) and 1752(a).

As relevant here, 18 U.S.C. § 111(a)(1) makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" a designated federal officer while that officer is "engaged in or on account of the performance of official duties[.]" Section 111(b) of that same provision increases the maximum penalty to twenty years if, during commission of the offense, the person "uses a deadly or dangerous weapon * * * or inflicts bodily injury[.]" 18 U.S.C. § 111(b). In this case, the indictment relied on the "deadly or dangerous weapon" component of that enhancement, and not the "bodily injury" component. *See* J.A. 2–5.

Section 1752(a) of Title 18 separately punishes various conduct in a "restricted building or grounds[,]" including, as relevant to the charges here, knowingly "enter[ing] or remain[ing]" in a restricted area, "engag[ing] in disorderly or disruptive conduct[,]" or "engag[ing] in any act of physical violence[.]" 18 U.S.C. § 1752(a)(1)-(2), (4). The statute then increases the available penalty to ten years of imprisonment if, "during and in relation to" commission of the Section 1752(a) offense, the person "uses or carries a deadly or dangerous weapon or firearm[.]" 18 U.S.C. § 1752(b)(1)(a).

Under Federal Rule of Criminal Procedure 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Where, as

here, defendants preserved their sufficiency challenges by raising them before the district court, we review *de novo* whether the evidence was sufficient, *United States v. Stoddard*, 892 F.3d 1203, 1213 (D.C. Cir. 2018), but "[o]ur review is highly deferential to the jury's decision[,]" *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022); *see also United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998). "We consider the evidence taken as a whole, and with reasonable inferences drawn in the light most favorable to the verdict." *United States v. Griffin*, 119 F.4th 1001, 1009 (D.C. Cir. 2024); *see also United States v. Kegler*, 724 F.2d 190, 196 (D.C. Cir. 1983) ("In weighing the evidentiary support for [a] verdict, it is elementary that we are required to view the evidence in the light most favorable to the jury's verdict."). "We will affirm a guilty verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Griffin*, 119 F.4th at 1009 (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)). "We draw no distinctions between direct and circumstantial evidence, and we give 'full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *Reynoso*, 38 F.4th at 1089 (quoting *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999)).

Schwartz, Brown, and Maly argue that they did not use pepper spray or a chair as deadly or dangerous weapons within the meaning of 18 U.S.C. § 111(b) or 18 U.S.C. § 1752(b)(1)(a). More specifically, Maly disputes that there was sufficient evidence to show he fired pepper spray at all, *see* Maly Opening Br. 10–11, as does Schwartz with respect to the thrown chair, *see* Schwartz Opening Br. 18. And all three claim that the pepper spray and chair were not used as deadly or dangerous weapons within the meaning of the two statutes.

Sometimes a weapon is inherently deadly or dangerous, like a gun. Other objects are not inherently deadly or dangerous, but they can become so if used in certain ways. All parties agree that the pepper spray and chair used here fall within the latter category, and so we assume the same for purposes of this opinion. *See* Brown Opening Br. 21, 25; Maly Opening Br. 12; Schwartz Opening Br. 16–17; Gov't Br. 19–21, 23, 31. As a result, the "deadly or dangerous" enhancements apply if the government proves beyond a reasonable doubt that: (1) "the object [is] capable of causing serious bodily injury or death to another person[,]" and (2) "the defendant * * * use[d] it in that manner[.]" *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (analyzing Section 111(b)).

Neither Section 111(b) nor Section 1752(b) defines "serious bodily injury," but other parts of Title 18 define that phrase as involving "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty[.]" 18 U.S.C. §§ 831(g)(4), 1864(d)(1), & 1365(h)(3). Schwartz, Brown, and Maly, as well as the government, assume that definition applies to Sections 111(b) and 1752(b), and so we assume so as well for purposes of this case. *See* Brown Opening Br. 21; Maly Opening Br. 3; Gov't Br. 20; Schwartz Opening Br. 15 (citing a substantively similar definition in the Sentencing Guidelines).

Given the record in this case, sufficient evidence supported the jury's finding that Schwartz, Brown, and Maly each used pepper spray as a deadly or dangerous weapon, and that Schwartz also used a chair as a deadly or dangerous weapon.

12

**1**

Pepper spray—also known as oleoresin capsicum spray or OC spray, and sometimes referred to as mace—is a "mixture of water and a chemical irritant" containing a small percentage of pepper. J.A. 1089–1090, 1421, 1654.

The evidence in this case showed that pepper spray can cause protracted vision loss. While the usual purpose of pepper spray is to "incapacitate" another party "without leaving serious injury," J.A. 1089–1090, the record showed that misuse of the spray can cause "permanent injury," J.A. 1092. In particular, if the spray is fired too close to the eyes, "hydraulic needling" can occur, which happens when the spray "get[s] into the [person's] eye fluid" and "penetrate[s] [the] eyeball[,]" causing "permanent" damage. J.A. 1092, 1661. For this reason, the Metropolitan Police Department ("MPD") prescribes minimum safe distances for officers' use of pepper spray. Those distances vary based on the size of the pepper spray canister. On January 6th, MPD officers carried three different sizes of canisters: MK-4 canisters, which are roughly the size of shaving cream bottles; MK-9 canisters, which are medium-sized and come in various concentrations; and MK-46 canisters, which look like "large black fire extinguisher[s.]" J.A. 1089, 1328, 1654, 1657–1659. Under MPD's use-of-force protocol, the minimum safe distance is three feet for use of MK-4, six feet for MK-9, and twelve feet for MK-46. J.A. 1092, 1661. One officer testified specifically that the use of MK-4 within three feet would constitute an "unauthorized level of force" that could inflict "serious injury on someone[.]" J.A. 1092.

The evidence also showed that pepper spray can cause extreme pain. During training, MPD officers are sprayed with pepper spray to understand its effects. J.A. 1093. From more

than three feet away, an officer sprays each trainee in the face with two one-second bursts. J.A. 1093, 1253. Officers described the training experience as "blinding and painful but not debilitating," J.A. 1253; as causing "intense burning for a long, long time[,]" J.A. 1566; and as amounting to a "9 or 10 out of 10" on a pain scale, J.A. 1377.

Officers testified that they felt such intense pain when sprayed on January 6th. For example, Officer Christopher Boyle stated that he felt a "9 or 10 out of 10" level of pain when he was pepper sprayed on the Lower West Terrace. J.A. 1377. Sergeant Jason Mastony testified that chemical irritants absorbed through his uniform so his "legs and [his] arms [we]re on fire." J.A. 1204. The effects of the chemical irritants, including "burning" "skin irritation[,]" lingered for about a week, and he felt particular pain when he showered or tried to change his contact lenses. J.A. 1247–1248. That is because pepper spray is water-based and "reactivates with water." J.A. 1093, 1253. Officer David Pitt testified that he had "severe burning for the following three days in [his] hands" and "in various places" from "when [he] was sprayed with various sprays in the tunnel." J.A. 1503. Finally, Sergeant Phuson Nguyen described that, when he showered the night of the 6th, "the chemical[s] [from the spray] soak[ed] through [his] pore[s] and it start[ed] burning, and basically [his] whole body was burning." J.A. 1587.

That evidence provided a sufficient basis for a rational jury to find that the pepper spray Schwartz, Brown, and Maly used was capable of causing extreme pain, especially given the officers' testimony that they felt a "9 or 10 out of 10" on a pain scale and that their limbs were "on fire" and "burning." Considering the intensely factual nature of an inquiry into the extent of pain caused by violent conduct, the evidence in this case, and the credibility judgments involved, there is no basis

for this court to overturn the jury's verdict by finding as a matter of law that the evidence came up short. *See also United States v. Mejia-Luna*, 562 F.3d 1215, 1222 (9th Cir. 2009) ("[T]he existence and definition of serious bodily injury in a given case is primarily a jury question dependent upon an evaluation of all the circumstances of the injury or injuries.") (quotation marks omitted); *see also United States v. Peneaux*, 432 F.3d 882, 891 (8th Cir. 2005) ("Determining whether an injury is serious is an issue for the jury to decide based on its 'common understanding' of the term[.]") (citation omitted).

Schwartz, Brown, and Maly object that the officers' pain did not constitute "serious bodily injury" because the pain was temporary. Not so. Officers testified that the sensation of "burning" skin lasted for several days after January 6th and even up to "about a week[.]" J.A. 1247–1248, 1503. In any event, nothing in law or logic supports the notion that intense suffering and torture qualify as serious injury only if they are clocked as crossing some unspecified time threshold.

The record evidence also supported the jury's conclusion that each defendant used pepper spray in a manner capable of causing such serious bodily injury.

Starting with Schwartz, the record contained both video evidence and witness testimony showing that, while on the Lower West Terrace, Schwartz sprayed a large MK-46 canister of pepper spray at police. Officer Boyle's testimony and body-worn camera footage showed Schwartz firing a fire-extinguisher-sized canister of OC spray in the direction of police officers. J.A. 1340–1344, 1666. The government also presented video evidence and witness testimony that Schwartz sprayed officers a second time around 2:35 PM—this time with an MK-9 canister. J.A. 1574–1584, 1666; Exhs. 105A.1, 117.1. Video footage shows Schwartz firing the powerful

spray directly into one officer's face. Exhs. 105A.1, 117.1. For both incidents, a rational jury could find that Schwartz fired the sprays in ways capable of causing either extreme physical pain or hydraulic needling.

Schwartz objects that the government did not prove the exact distance from which he fired the sprays, identify whether any officers were actually hurt, or prove that Schwartz intended to injure the officers. *See* Schwartz Opening Br. 16–17; Schwartz Reply Br. 4. But none of that is necessary for a jury to convict Schwartz of using pepper spray as a deadly or dangerous weapon. The video evidence allowed the jury to gauge whether the sprays came from unsafe distances and supported a finding that they were used at too-close ranges. Exhs. 105A.1, 117.1. Whether actual injury resulted is beside the point. The enhancement applies whenever a weapon is used in a manner that *could* have caused serious bodily injury. *Arrington*, 309 F.3d at 45; *see also United States v. Anchrum*, 590 F.3d 795, 802 (9th Cir. 2009).

As for Schwartz's intent argument, under Section 111(b), a defendant must "intend to use the object[,]" but need not "*intentionally use the object as a weapon.*" *Arrington*, 309 F.3d at 45–46. That same reasoning applies to Section 1752(b)(1)(a), which requires only that the defendant intend to "use[] or carr[y]" the object. 18 U.S.C. § 1752(b)(1)(a). Here, the evidence was more than sufficient to show that Schwartz intended to carry and use the pepper sprays. The video footage demonstrates beyond a reasonable doubt that he intentionally fired the spray, as opposed to, for example, accidentally bumping into the canisters and inadvertently compressing their triggers.

As for Maly, the evidence showed that he fired pepper spray at officers, including Officer Boyle, on the Lower West

Terrace. J.A. 1352–1365; Exh. 120.2. Officer Boyle testified, consistent with his body-worn-camera footage, that Maly was holding "what appear[ed] to be a chemical OC spray." J.A. 1365. He further testified that when he was sprayed, "it hurt immediately" and he felt "burning, pain[,]" that was "[c]onsistent" with the feeling of his prior experiences with OC spray. J.A. 1368. And Maly admitted upon his arrest that, on January 6th, he "picked up a canister or two of [] pepper spray and then sprayed them at police officers." J.A. 1896. Viewed in the light most favorable to the jury's verdict, this evidence establishes beyond a reasonable doubt that Maly deployed OC or chemical spray in a manner capable of causing extreme pain to one or more officers. *See also Reynoso*, 38 F.4th at 1089 ("[W]e give full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.") (citation omitted).

Finally, the video evidence against Brown showed that he shot pepper spray from close range at the line of officers guarding the Tunnel. Exh. 103.9. Two officers who had been stationed in the Tunnel testified that they heard a "hiss" "consistent with a chemical irritant spray" or "aerosol spray" at the time video evidence showed Brown discharging a canister. J.A. 1210–1211; J.A. 1497–1498. Body-worn camera videos corroborated that testimony. Reviewing a still image taken from other footage, a third officer testified that Brown fired a "civilian OC spray[]" that released "amber spray" "consistent" with OC spray. J.A. 1214, 1218, 1693–1695.

To be sure, officers did not testify that Brown fired spray directly into their eyes, and the video evidence suggests that officers in the Tunnel had protective gear, including helmets and shields. Exh. 103.9. But officers told the jury that they suffered pain from sprays in the Tunnel even though they wore

gear and even though some sprays were not fired into their eyes. Sergeant Mastony explained that chemical irritants absorbed through his uniform so that his legs and arms were "on fire." J.A. 1204. His "body [wa]s pretty much on fire." J.A. 1204. Sergeant Nguyen testified that Brown's particular spray affected him in "one way or another" because the officers were "in such a confined space" and the wind that day blew sprays back into the officers in the Tunnel. J.A. 1590. Officer Boyle stated that shields were ineffective at preventing police from being sprayed because "when you get sprayed it splashes[.]" J.A. 1376. Spray "can go anywhere." J.A. 1376.

In sum, sufficient evidence supported the jury's findings that Schwartz, Brown, and Maly each used pepper spray as a weapon and did so in a deadly or dangerous manner.

**2**

The evidence likewise supported the jury's verdict that Schwartz threw a chair at officers and, in so doing, used it as a deadly or dangerous weapon. The evidence showed that, around 2:30, the line of officers on the Lower West Terrace began to collapse. J.A. 1439. A Capitol police officer who was "trying to keep [rioters] back from breaking the line" then "got overextended into the crowd" and fell. J.A. 1439. Officer David Pitt "moved up" to "grab[]" his colleague's vest and try to "pull him back behind [the] police line to stop him from being assaulted." J.A. 1439. As Officer Pitt was doing so, he was hit in the head by a folding chair that a rioter had thrown. J.A. 1439; *see also* Exh. 116.12. Officer Pitt did not see who threw the chair, J.A. 1485–1488, but Schwartz wrote in a text message on January 7, 2021: "I threw the first chair at the cops after they maced us." J.A. 2020. An FBI case agent also testified at trial that, based on video evidence, Schwartz was standing in the part of the crowd from which the folding chair

was thrown. J.A. 2039. The video evidence also shows that the chair was thrown with force and at high speed directly at the police officers and that it actually struck Officer Pitt in the head. Exh. 116.12.

Given the content of the video and Schwartz's text message about throwing a chair, the jury reasonably found both that Schwartz was the one who threw the chair that struck the officer and that his action posed a risk of serious injury to the officers as they were attempting to hold back the mob.

Schwartz counters that there was no risk of serious injury because the officers were outfitted with "helmet[s], pads, and other protective gear." Schwartz Opening Br. 18. That is incorrect. A chair is used in a dangerous manner when, even though "[f]ortuitously[] the wound inflicted was not serious," circumstances could have made it so. *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963) (A chair "brought down" on a victim's head was used as a dangerous weapon even though it caused no "serious" injury because "had the blow fallen an inch lower it could have endangered [the victim's] eye, or if slightly higher, a dangerous head wound was likely."). Although Officer Pitt and the colleague he assisted both wore helmets and pads, that gear did not cover their entire bodies. And the video evidence shows that, right after the chair hit Officer Pitt, his colleague fell back and his eye visor lifted. Exh. 116.12. Video evidence from around that same time reveals that other officers on the Lower West Terrace had lifted their visors. Exhs. 106A.4; 105A.1. One officer had no helmet, visor, or apparent padding at all. Exh. 105A.1.

All of this to say, the fortuity that neither Officer Pitt nor his colleague were seriously injured does nothing to detract from the jury's conclusion that Schwartz's hurling of the chair—indiscriminately at a line of officers with varying levels

of protective gear—could have caused serious injury. For that reason, sufficient evidence supported the jury's finding that Schwartz used the chair as a deadly or dangerous weapon.

**B**

Schwartz separately argues that the district court should have suppressed evidence obtained from his cellphone because the compelled unlocking of his phone violated the Fourth and Fifth Amendments. Because we agree with Schwartz that the compelled opening violated the Fifth Amendment, we need not address his Fourth Amendment claim.

**1**

Before trial, Schwartz moved to suppress evidence obtained from his cellphone, which was seized at the time of his arrest. J.A. 95–102. The district court held a hearing and made numerous relevant factual findings. The district court then denied suppression, finding that no constitutional violation occurred.

In so holding, the court found that FBI Agent Michael Nealon was part of the team that executed a search warrant at Schwartz's residence on February 4, 2021. J.A. 406; *see also* J.A. 380. By the time Agent Nealon arrived, Schwartz had already been taken into custody pursuant to an arrest warrant and placed in an FBI vehicle. J.A. 376–377, 406. During the search, Agent Nealon found a black cellphone on the bedroom dresser in Schwartz's one-bedroom apartment. J.A. 406. Agent Nealon then approached Schwartz and asked for the password to the phone. J.A. 406. Schwartz offered three options, which Agent Nealon tried, but none unlocked the device. J.A. 406.

Agent Nealon returned to the vehicle and was "able to obtain Mr. Schwartz's thumbprint to open the phone." J.A. 406–407. Agent Nealon, however, did not "recall precisely how that was done" and did not "remember the conversation" he had with Schwartz. J.A. 407. The agent testified that his "ordinary practice" was to ask whether the person in custody "wishe[d] to have any numbers accessed so that they c[ould] be provided" for use at the jail. J.A. 407. The district court found that Agent Nealon "presumably" thought he followed that practice and that "Mr. Schwartz, in response to that request, did put his thumb on the telephone, thereby opening it." J.A. 407.

Agent Nealon brought the unlocked phone inside, and another FBI agent photographed information on it, including text messages. J.A. 407; *see also* J.A. 460. The agents did not conduct a forensic search of the phone at that time.

Seven months later, the FBI obtained a second warrant to conduct a forensic search of the cellphone. J.A. 393–394, 407. The affidavit accompanying the search warrant application included photographs taken during the February 4th search and stated that FBI agents had "used Schwartz's fingerprint to unlock" the device during the search. Gov't Rule 28(j) Letter (Nov. 14, 2024), Exh. 2 at 16–20.

In its initial briefing before the district court, the government argued that Schwartz's thumbprint was not testimonial and that he had consented to use of his thumb to open the phone. Gov't Opp. to Schwartz's Mot. to Suppress at 8–11. But after the suppression hearing, the government conceded that Schwartz had been "compelled" to produce his fingerprint. Gov't Resp. to Schwartz's Suppl. to Mot. to Suppress at 6. In other words, the government admitted that

Schwartz's opening of the cellphone with his thumbprint was involuntary.

The government did not explain the reason for this concession, but the record suggests that the change may have had to do with the timing of Schwartz's request for an attorney while in custody. According to the government, when Schwartz was initially questioned by police, he was advised of his *Miranda* rights and agreed to speak to agents without an attorney present. *Id.* at 1–2.[1] At some point, and agents "could not recall" whether that point fell before or after Schwartz opened the phone, Schwartz requested an attorney. *Id.* at 3 n.3.

Given this concession, the district court found that the FBI "compelled" Schwartz to "open and inspect his mobile phone[.]" J.A. 477. The court nevertheless concluded that the compelled disclosure was not a testimonial act, reasoning that the Fifth Amendment privilege does not apply when "'the [g]overnment merely compels some physical act, i.e., where the individual is not called upon to make use of the contents of his mind.'" J.A. 477 (quoting *In re Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 537 (D.D.C. 2018)). The court also found that the good faith exception, though typically relevant in the Fourth Amendment context, applied to Schwartz's Fifth Amendment claim. J.A. 478.

In reviewing the district court's denial of a suppression motion, we review legal conclusions *de novo* and factual findings for clear error. *United States v. Guertin*, 67 F.4th 445, 449 (D.C. Cir. 2023). "We will affirm the judgment of the district court if 'any reasonable view of the record supports its denial of the motion to suppress.'" *United States v. Hutchings*,

---

[1] As noted below, Schwartz disputes this account.

99 F.4th 604, 607 (D.C. Cir. 2024) (quoting *United States v. Miller*, 799 F.3d 1097, 1101 (D.C. Cir. 2015)).

**2**

The district court erred in denying Schwartz's suppression motion because the compelled opening of the cellphone was testimonial under the Fifth Amendment.

**a**

The Fifth Amendment provides that "[n]o person shall be * * * compelled in any criminal case to be a witness against himself[.]" U.S. Const. Amend. V. To fall within the Fifth Amendment's protection, "a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 189 (2004). The district court found, and the government agrees, that the police "compelled" Schwartz to open the phone. J.A. 477; Gov't Br. 38.

The parties also do not dispute that the compelled opening of the cellphone was incriminating as it identified Schwartz as the likely owner of, and a person with access to and control over, the phone and its inculpatory messages. *See Kastigar v. United States*, 406 U.S. 441, 445 (1972) (The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.").

That leaves only the first prong of the Fifth Amendment claim at issue in this case—whether disclosing to police Schwartz's way of opening the cellphone and his ability to do so was testimonial. Testimonial communications are those that, "explicitly or implicitly, relate a factual assertion or

disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). Communications need not be verbal or written to qualify, *Schmerber v. California*, 384 U.S. 757, 763–765 (1966), and the question of whether a communication is testimonial often "depend[s] on the facts and circumstances of [a] particular case[,]" *Fisher v. United States*, 425 U.S. 391, 410 (1976).

Because Agent Nealon could not recall his conversation with Schwartz, the district court found only that Agent Nealon followed his "ordinary practice" of asking Schwartz if he wanted to access information on the phone for use later at the police station, and that the agent then "compelled" Schwartz to open the phone. J.A. 407, 477. In other words, the record reveals that an FBI agent ordered Schwartz to open the cellphone, and Schwartz complied by placing his thumb on the cellphone.

That compelled biometric unlock of a cellphone arises at the intersection of the Fifth Amendment's physical-trait and act-of-production precedents. *See United States v. Payne*, 99 F.4th 495, 508 (9th Cir. 2024).

Generally, the use of an individual's physical traits by police is not considered testimonial. For example, the Fifth Amendment does not protect against the involuntary furnishing of a blood sample, *Schmerber*, 384 U.S. at 765; submitting to fingerprinting, *see United States v. Wade*, 388 U.S. 218, 223 (1967); providing a handwriting exemplar, *Gilbert v. California*, 388 U.S. 263, 266–267 (1967); providing a voice exemplar, *United States v. Dionisio*, 410 U.S. 1, 7 (1973); standing in a police lineup, *Wade*, 388 U.S. at 221–222; or donning particular clothing, *Holt v. United States*, 218 U.S. 245, 252–253 (1910). "[T]he privilege was not implicated in each of those cases, because the suspect was not required 'to

disclose any knowledge he might have,' or 'to speak his guilt[.]'" *Doe*, 487 U.S. at 210–211 (citations omitted).

But the inquiry is contextual. Some displays of physical traits can be testimonial. For example, lie detector tests "may actually be directed to eliciting responses which are essentially testimonial." *Schmerber*, 384 U.S. at 764. Compelling a person to submit to a test "in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment." *Id.*

The physiological changes observed during a lie detector test—*e.g.*, an uptick in heart rate or an increase in respiration—are testimonial because they are manifestations of testimonial thoughts in the defendant's mind. A racing heartbeat is a physical representation of the thought "what I said is false" or "I am scared to say this," which—if the subject had been compelled to say—would be testimonial. Put differently, the physical response "disclose[d]" the subject's "knowledge" and the thoughts of his mind. *Doe*, 487 U.S. at 211 (quoting *Wade*, 388 U.S. at 222). By contrast, standing in a police lineup or providing a blood sample or handwriting exemplar—when instructed to do so—communicates only that the subject knows how to comply with orders. But those acts are not manifestations of any testimonial thoughts.

Though placing a thumb on a phone may seem akin to submitting to fingerprinting or providing a handwriting exemplar, the act, as performed here, is much closer to responding to a lie detector test or complying with a command to say a password. When Schwartz was ordered to open the cellphone, his act of unlocking the phone represented the thoughts "I know how to open the phone," "I have control over and access to this phone," and "the print of this specific finger

is the password to this phone." If Schwartz had instead been compelled to disclose whether he could open the phone, and made to say yes or to verbally disclose the password, those answers unquestionably would be testimonial communications. The compelled opening of the cellphone that occurred here is no different.

Another way of understanding the Supreme Court's physical trait cases is that testimonial acts are those physical actions that require no additional information to communicate an incriminatory message. A blood draw reveals the blood-alcohol content of an individual only when chemically analyzed. *See Schmerber*, 384 U.S. at 765. A handwriting exemplar reveals the identity of its author only when compared to another handwriting sample. *See Gilbert*, 388 U.S. at 266–267. But the compelled opening of a cellphone itself directly announces the owner's access to and control over the phone, as well as his mental knowledge of how to unlock the device. There is no additional information that is needed to understand the messages communicated by the act of opening a phone. In that way too, forcing Schwartz to open the phone was testimonial.

The act-of-production line of cases confirms that compelling Schwartz to open the phone was testimonial. The act-of-production doctrine recognizes that physical acts can be "communicative" "wholly aside from the contents" of anything produced, *Fisher*, 425 U.S. at 410, when the action "impl[ies] assertions of fact," *Doe*, 487 U.S. at 209; *see also Payne*, 99 F.4th at 509 ("Although act of production cases have dealt exclusively with responses to document subpoenas, their reasoning applies to other situations."). Take *Doe* and *United States v. Hubbell*, 530 U.S. 27 (2000)—the two cases that, according to *Payne*, show the "act of production doctrine's triggering point[.]" *Payne*, 99 F.4th at 509.

In *Doe*, the government forced Doe to sign a form consenting to disclosure of "any and all [foreign bank] accounts over which Doe had a right of withdrawal, without acknowledging the existence of any such account." 487 U.S. at 204. The Court held that neither the consent directive nor Doe's signature on it were testimonial. The Court reasoned that the form was "carefully drafted not to make reference to a specific account," and therefore did "not acknowledge that an account in a foreign financial institution [wa]s in existence or that it [wa]s controlled" by Doe. *Id.* at 215. Likewise Doe's signing of the form "ma[de] no statement, explicit or implicit, regarding the existence of a foreign bank account or his control over any such account. Nor would his execution of the form admit the authenticity of any records produced by the bank." *Id.* at 215–216.

The Supreme Court was careful not to hold that *any* kind of compelled consent would be non-testimonial. The Court held only that the specific consent form at issue in that case, which was "carefully drafted" to avoid reference to or the identification of any specific bank accounts, was not testimonial. *Doe*, 487 U.S. at 215. Because of that drafting, the Court explained, Doe's signature on the form did not confirm the existence of or his control over any account, nor did he authenticate the records from the bank.

This case is the opposite. Because the FBI directed Schwartz to open the phone, the government compelled Schwartz to disclose his knowledge of how the phone could be opened, and specifically his understanding that his thumb would unlock the device, and those disclosures revealed his ownership or control over the phone and the messages it contained.

Similarly, in *Hubbell*, the government issued a subpoena *duces tecum* for the production of eleven categories of documents. 530 U.S. at 31. After receiving an assurance of immunity, the respondent produced 13,120 pages of documents and "responded to a series of questions that established that those were all of the documents in his custody or control that were responsive to the commands in the subpoena[.]" *Id.*

The Supreme Court found that this act of production communicated two testimonial messages. First, the subpoena response established "the existence, authenticity, and custody of the items" produced. *Hubbell*, 530 U.S. at 41. Second, the identification and assembly of those hundreds of documents required the respondent to make "extensive use of 'the contents of his own mind'" and were "tantamount to answering a series of interrogatories asking a witness to disclose the existence and location of particular documents fitting certain broad descriptions." *Id.* at 41, 43 (citation omitted).

So too here. When, in response to the command to unlock the phone, Schwartz opened it, that act disclosed his control over the phone, his knowledge of how to access it, and the existence, authenticity, and ownership of documents within it. In addition, opening the phone was tantamount to answering a series of questions about ownership or control over the phone, including how it could be opened and by whom.

In short, under both the physical-trait and act-of-production caselaw, Schwartz's compelled unlocking of the phone was testimonial.[2]

---

[2] This holding is consistent with the Ninth Circuit's decision in *Payne*, 99 F.4th at 509–513. In that case, instead of instructing the defendant to open his phone, as the FBI instructed Schwartz to do,

**b**

Because the compelled opening of the cellphone was testimonial, both the message communicated by that action and any evidence obtained from that communication must be suppressed. *See Kastigar*, 406 U.S. at 445 (The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."); *Harrison v. United States*, 392 U.S. 219, 222 (1968) ("[T]he same principle that prohibits the use of confessions [wrongfully obtained] also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a time-worn metaphor."). In unlocking the phone, Schwartz disclosed that he had access to the phone and therefore also the ability to use it, and the government then used those testimonial acts in prosecutorial actions against Schwartz.

First, as a consequence of Schwartz unlocking the phone, the FBI agents gained access to the phone and photographed text messages "related to Schwartz's presence at the U.S. Capitol on January 6." J.A. 407, 460.

Second, the government relied on those text messages, as well as the fact that "Schwartz's fingerprint [] unlock[ed]" the phone, to establish probable cause to obtain a second warrant

---

the police "forcibly grabbed Payne's thumb and used it to unlock the phone." *Id.* at 500. The Ninth Circuit found that act was not testimonial, *id.* at 509–512, but the court emphasized that its "opinion should not be read to extend to *all* instances where a biometric is used to unlock an electronic device[,]" *id.* at 513. "Indeed, the outcome on the testimonial prong may have been different[,]" the Ninth Circuit recognized, "had [the] [o]fficer [] required Payne to independently select the finger that he placed on the phone." *Id.* That is this case.

for a forensic analysis of the phone. Gov't Rule 28(j) Letter, Exh. 2 at 16–20. With that warrant in-hand, an FBI computer analyst "extracted the data from the phone" and produced a "usable report" of the phone's contents. J.A. 2014.

Third, the government introduced that report into evidence at trial, relied on the report to prove Schwartz was the "owner and user of the telephone[,]" and then introduced incriminating text messages reflected in the report. J.A. 2014–2036.

Because the evidence on Schwartz's phone was the product of a Fifth Amendment violation, the district court erred in denying Schwartz's motion to suppress use of that evidence and its fruits in his prosecution.

The government maintains, however, that even if the evidence was obtained in violation of the Fifth Amendment, suppression is unnecessary both because the phone's contents and linkage to Schwartz inevitably would have been discovered, and because the officers acted in good faith. Neither argument succeeds.

**(i)**

The inevitable-discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016); *see also Nix v. Williams*, 467 U.S. 431, 448 (1984) (When "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."); *McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020) ("The inevitable-discovery doctrine can apply when a Fifth Amendment violation occurs."); *United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995) ("The inevitable discovery doctrine allows the

introduction of evidence acquired in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights[.]"); *United States v. Fisher*, 700 F.2d 780, 784 (2d Cir. 1983); *United States v. Schmidt*, 573 F.2d 1057, 1065–1066 n.9 (9th Cir. 1978); *Nix*, 467 U.S. at 440–441 n.2.

The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered independently of the Fifth Amendment violation. *Nix*, 467 U.S. at 444–445 n.5.

Here, the government argues that it would have inevitably confirmed Schwartz's ownership of his phone and discovered its contents because FBI agents obtained a second warrant seven months later to search the phone. Gov't Br. 45. The affidavit in support of that warrant, however, relied on the Fifth Amendment violation—that Schwartz's thumbprint unlocked the phone—and the inculpatory text messages the phone contained to establish probable cause for that later warrant. *See* Gov't Rule 28(j) Letter, Exh. 2 at 16–20. Reliance on tainted evidence generally indicates that the later discovery was not so inevitable after all. *See Nix*, 467 U.S. at 448 ("[T]he evidence in question" must "have been discovered *without reference to the police error or misconduct*[.]") (emphasis added).

The government insists, though, that probable cause to search the contents of the phone existed even without reference to the tainted evidence. *See* Gov't Rule 28(j) Letter. Maybe. But even if it did, the government has not shown that it could have unlocked the cellphone without relying on a testimonial communication.

As it turns out, the government later was able to unlock Schwartz's cellphone by using a variation of one of the passwords Schwartz had supplied during the custodial interview following his arrest. Gov't Resp. to Schwartz's

Suppl. to Mot. to Suppress at 10. Yet the government concedes that Schwartz's disclosure of his passwords was testimonial. Gov't Opp. to Schwartz's Mot. to Suppress at 8–9 ("[C]ompelling a defendant to communicate a password * * * would be 'testimonial' under the Fifth Amendment[.]"). The government tries to surmount that hurdle by arguing that Schwartz voluntarily supplied those passwords. Gov't Resp. to Schwartz's Suppl. to Mot. to Suppress at 2 ("Schwartz voluntarily provided three passwords[.]"). In other words, it claims the passwords were not compelled. *See Hiibel*, 542 U.S. at 189 (To receive Fifth Amendment protection, "a communication must be testimonial, incriminating, *and* compelled.") (emphasis added).

The government, however, has failed to carry its burden of proving the voluntariness of the password disclosures. According to the government, an FBI agent had begun questioning Schwartz and had advised him of his *Miranda* rights before Agent Nealon approached to ask for the cellphone passwords. Gov't Resp. to Schwartz's Suppl. to Mot. to Suppress at 2 n.2. But Schwartz disputes that account, *see* Schwartz Reply Br. 12, and the district court made no factual findings about the timing or adequacy of any *Miranda* warnings or the voluntariness of those password disclosures, *see* J.A. 405–409. Given this bare record and conflicting views of what occurred based on unresolved factual disputes, the government has failed to establish by a preponderance of the evidence that Schwartz voluntarily supplied the passwords to his phone.

All of this is a long way of saying that, on this record, the government has not met its burden of showing that it would have gained access to the phone's contents by some independent, lawful means.

**(ii)**

The government's second tack is to argue, as the district court found, that the Fourth Amendment's good faith exception to the exclusionary rule should be extended to Fifth Amendment violations as well. Gov't Br. 45 n.14.

That argument fails for multiple reasons.

To start, the government cannot show good faith here because the officer could not remember the relevant facts of how he compelled Schwartz to open the phone. In particular, at no point did the officer claim to have relied upon the warrant or any other relevant legal authority as empowering him to compel Schwartz to open his phone.

Nor could the agent have. The warrant expressly withheld authority to "demand" that Schwartz provide the password or "identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s)[,]" unless the agents "ma[d]e clear that providing any such information is voluntary and that [Schwartz] [wa]s free to refuse the request." Suppl. App. 10. The good faith exception does not apply when officers fail to comply with express limitations in the warrant. *See United States v. Leon*, 468 U.S. 897, 920 (1984) (The good faith exception is appropriate "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and *acted within its scope*[.]") (emphasis added).

Finally, the government fails to provide any developed argument in support of extending the good faith exception to the Fifth Amendment, offering only a cursory footnote. So the argument is forfeited, and we need not decide whether the good faith exception applies to Fifth Amendment violations. *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is

no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.").

Accordingly, the district court erred in denying Schwartz's motion to suppress the evidence obtained from the compelled opening of the cellphone. We remand to the district court to decide whether that error was harmless beyond a reasonable doubt as to any counts. *See Chapman v. California*, 386 U.S. 18, 19, 24 (1967) (applying harmless beyond a reasonable doubt standard when prosecution commented on defendants' failure to testify); *Milton v. Wainwright*, 407 U.S. 371, 372 (1972) (applying harmless beyond a reasonable doubt standard when defendant's incriminating statements were admitted at trial in a federal habeas case predating *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

**3**

Schwartz also claims the government violated the Fourth Amendment because the use of his thumbprint did not comply with the procedures in the February 2021 search warrant. Because Schwartz seeks to suppress the same records under the Fourth and Fifth Amendments, and the harmless error analysis is the same under both, we need not decide his Fourth Amendment claim. *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) (applying the harmless beyond a reasonable doubt standard to admission of evidence seized in violation of the Fourth Amendment); *Chambers v. Maroney*, 399 U.S. 42, 53 (1970) (same).

**C**

As his final argument on appeal, Schwartz claims the district court violated Federal Rule of Criminal Procedure 8

when it permitted joinder of the three co-defendants' cases. Even assuming the joinder was error given their very limited interactions, Schwartz has not shown, or even argued, that he suffered any prejudice from the district court's decision to join the cases. "[A]n error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**D**

Next, we turn to Maly's challenge to the district court's jury instructions. He claims the district court erred by refusing to give the jury a special unanimity instruction for Counts Five and Seven—the two Section 111 charges against him. Maly Opening Br. 19–24; J.A. 3–5. By way of reminder, Section 111(a)(1) provides that whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with [an officer] while engaged in or on account of the performance of official duties" is subject to criminal penalties. 18 U.S.C. § 111(a)(1).

According to Maly, the court should have directed the jury that, to convict, it had to unanimously agree on which verb—that is, assault, resist, oppose, impede, intimidate, or interfere—applied to his conduct. The district court denied the request on the ground that unanimity is "required as to an element of an offense[,]" but not "the means by which an element is satisfied." J.A. 2554.

We review *de novo* the district court's refusal to provide a requested jury instruction. *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010). "The pertinent question is 'whether, taken as a whole, [the instructions] accurately state

the governing law and provide the jury with sufficient understanding of the issues and applicable standards.'" *Id.* (quoting *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997)).

No special unanimity instruction was required here. Though federal juries must reach unanimity on each element of an offense, they "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999).

The critical question, then, is whether the verbs in Section 111(a) constitute distinct "elements" or "means" of committing the offense. In Section 111(a)(1), the listed ways in which the offense could be committed are means, not elements.

To start, that is what the language of the statute says. *See Richardson*, 526 U.S. at 818. The statute lists all of the acts of violation in one sentence, and imposes a single, identical penalty for all of them. That construction "'indicates that Congress did not mean to create more than one offense.'" *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995) (quoting *United States v. Mal*, 942 F.2d 682, 688 (9th Cir. 1991)); *see United States v. McIntosh*, 753 F.3d 388, 393 (2d Cir. 2014); *see also* U.S.S.G. § 2A2.4 (not distinguishing among the verbs in imposing a sentence for Section 111 offenses). In so holding, we agree with the decisions of the Second and Eighth Circuits that the statutory text sets out alternative means of committing a single offense, rather than different offenses. *See Street*, 66 F.3d at 974; *McIntosh*, 753 F.3d at 393.

That reading of Section 111(a) accords with Congress's purpose to protect "the safety of federal officers insofar as it

was tied to the efficacy of law enforcement activities." *United States v. Feola*, 420 U.S. 671, 681 (1975). For that reason, "the statute must be read as prohibiting any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties." *United States v. Walker*, 835 F.2d 983, 987 (2d Cir. 1987). That purpose does not admit of gradations among different kinds of interfering conduct or different types of threats. Instead, it makes a "single crime of harming or threatening a federal official" during the performance of her duties, and "specifie[s] six ways by which the crime c[an] be committed." *Street*, 66 F.3d at 975; *see McIntosh*, 753 F.3d at 393.

Of course, the statutory meaning must also comport with the Constitution, which "limits [Congress's] power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." *Richardson*, 526 U.S. at 820. In *Schad v. Arizona*, 501 U.S. 624 (1991), *abrogated on other grounds by Ramos v. Louisiana*, 590 U.S 83 (2020), the Supreme Court ruled that the need for specificity turns on the Due Process Clause's demands for fundamental fairness, "and for the rationality that is an essential component of that fairness," *id.* at 637 (plurality opinion); *see also id.* at 650, 652 (Scalia, J., concurring in part and concurring in the judgment) ("It is precisely the historical practices that *define* what is 'due.' * * * Th[e] requirement of [due process] is met if the trial is had according to the settled course of judicial proceedings.") (citation omitted).

*Schad* found no constitutional problem where the two means of committing the offense (there, murder) "reasonably reflect notions of equivalent blameworthiness or culpability[.]" *Schad*, 501 U.S. at 643 (plurality opinion).

So too for Section 111(a)(1). Each of the qualifying actions—"assaults, resists, opposes, impedes, intimidates, or interferes with" an officer—must be committed "forcibly." 18 U.S.C. § 111(a)(1). In that way, the statute assigns equivalent blameworthiness to conduct that forcibly obstructs law enforcement officers in the performance of their duties. While only "assault" requires actual injury or threat of injury, the other actions listed necessarily carry a risk of injury because they must be undertaken "forcibly." *Id.*; *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 887 (1993) (def. 1c) (defining "force" as "power to affect in physical relations or conditions"); BLACK'S LAW DICTIONARY 718 (9th ed. 2009) (defining "force" as "[t]o compel by physical means or by legal requirement"). Shoving someone risks that the person will fall and hurt herself. Kicking someone risks that the person will bruise or bones will be broken. And, as relevant here, spraying someone with pepper spray at an unsafe range risks causing injuries to the eye and the intense pain of burning skin. Moral equivalence between assault and the other means of violating Section 111(a)(1) can thus "reasonably be found[.]" *See Schad*, 501 U.S. at 644 (plurality opinion).

Maly relies on *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ("*North I*"), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990). To start, the part of that opinion that Maly relies on was vacated and so lacks precedential force.

Anyhow, in *North I*, the defendant could have been found guilty for "destroying, altering, or removing" documents. *North I*, 910 F.2d at 876. The critical difference is that the defendant had testified to doing each of those kinds of conduct at distinct points in time. He destroyed certain documents, altered some, and removed still others. *Id.* at 876–878. As a result, the panel was concerned that different jurors could have

found that the government had proven different criminal acts at different times, without ever agreeing that one single criminal act was committed. *Id.* at 878.

Here, by contrast, the relevant counts did not sweep in multiple acts at different times or locations. Count Five charged Maly only with a Section 111 offense "at approximately 2:35 PM with pepper spray" on the Lower West Terrace. Count Seven separately charged him with a Section 111 offense "between approximately 3:07 pm and 3:10 pm with pepper spray[]" in the Tunnel. J.A. 2273. Each count charged a distinct incident and, at most, jurors disagreed about which verb best fit Maly's conduct on each of those two occasions.

Maly nonetheless argues that jurors might have convicted him on Count Five for two "separate act[s]." Maly Opening Br. 23. Specifically, Maly disputed at trial whether the cannister he pointed at Officer Boyle contained any OC or pepper spray. He thus claims "some jurors could have concluded that [he] opposed officers" when he pointed a "less-than-lethal" spray bottle at them, while other jurors "might have concluded that he engaged in a separate act by actually deploying the spray in their direction." *Id.* But these two different versions of events still refer to the same action and moment in time: Maly pointing a spray canister at Officer Boyle at 2:35 PM on the Lower West Terrace. Jurors may have disagreed about what exactly happened at that moment. But because Section 111 criminalizes forcibly "oppos[ing]" an officer with an empty canister, threatening to assault him, or actually assaulting him, jurors reached unanimity that the same incident violated the statute.

For those reasons, the district court properly declined to give a special unanimity instruction.

**E**

Lastly, Brown claims the district court abused its discretion by not granting a downward variance to a sentence of no more than 40 months. Brown Opening Br. 25. He argues, in particular, that the 54-month sentence he received was disproportionate to that imposed on comparably culpable defendants.

Brown does not claim that there was any procedural error in the district court's sentencing. He just disputes its bottom-line appropriateness. We review the substantive reasonableness of criminal sentences for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). "Our review is 'quite deferential,' meaning that it is an 'unusual case' in which the district court abuses its discretion." *United States v. Alford*, 89 F.4th 943, 948 (D.C. Cir. 2024) (citation omitted). This is not an unusual case.

Most relevantly, the district court did grant Brown a downward variance from the Sentencing Guidelines range. Brown's suggested Guidelines range was 63 to 78 months of imprisonment, but the district court sentenced him to only 54 months. J.A. 2679, 2689. So Brown got a variance as requested. It just was not as large as he desired.

That was in no way an abuse of discretion. Sentences *within* the Guidelines range receive a "presumption of reasonableness," *Alford*, 89 F.4th at 953 (quoting *United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008)), and are presumed to be "not excessive[,]" *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023). That presumptive reasonableness has particular force when a defendant alleges an unwarranted disparity, as Brown does here, because the "avoidance of unwarranted disparities was clearly considered

by the Sentencing Commission when setting the Guidelines ranges." *Id.* (quoting *Gall*, 552 U.S. at 54). So when a district court is afforded a presumption of reasonableness, its decision "will almost never be reversed on appeal as substantively unreasonable." *Alford*, 89 F.4th at 953 (citation omitted).

Because sentences within the Guidelines range receive this strong presumption, it is "hard to imagine" how a below-Guidelines sentence could be unreasonably high or disproportionate. *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) (citation omitted). And Brown's arguments do nothing to fuel our imagination.

First, Brown argues that the presumption of reasonableness should not apply to a January 6th defendant. Brown Reply Br. 1–2. This court has already held otherwise. *See Alford*, 89 F.4th at 953. Plus, any considerations unique to Brown's circumstances were already factored into the downward variance the court gave. J.A. 2682.

Second, Brown fails to demonstrate any unreasonableness when his sentence is compared to those of other January 6th rioters. *See* 18 U.S.C. § 3553(a)(6) (Judges should avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"). Brown points to eight other January 6th defendants whose sentences he believes show that his sentence was too long. Brown Opening Br. 26–34. But the comparisons do not hold up to scrutiny.

Four received shorter sentences than Brown did, but each pled guilty. *See* Judgment at 2, *United States v. Richardson*, No. 21-cr-721-CKK (46 months); Judgment at 2, *United States v. Languerand*, No. 21-cr-353-JDB (44 months); Judgment as to Jerod Wade Hughes at 2, Order Reducing Sentence as to Joshua Calvin Hughes at 1, *United States v. Hughes*, No. 21-

cr-106-TJK (46 months and 33 months for co-defendant brothers). "Defendants who go to trial are not 'similarly situated' to those who plead guilty, and therefore 'the disparity in their treatment' is generally permissible." *United States v. Webster*, 102 F.4th 471, 490 (D.C. Cir. 2024) (quoting *Otunyo*, 63 F.4th at 960); *see also United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013) ("That some defendants pled guilty while others did not provides a perfectly valid basis for a sentencing disparity, and such disparity impose[s] no impermissible burden on [a defendant's] jury-trial right[.]") (citations omitted).

In addition, each of those defendants pled guilty to only one felony, unlike Brown who was convicted of two felonies. *See* Plea Agreement at 1, *United States v. Richardson*, No. 21-cr-721-CKK (defendant pled guilty to 18 U.S.C. § 111(a)(1)); Plea Agreement at 1, *United States v. Languerand*, No. 21-cr-353-JDB (defendant pled guilty to 18 U.S.C. § 111(a)(1) and (b)); Plea Agreement as to Jerod Wade Hughes at 1, Plea Agreement as to Joshua Calvin Hughes at 1, *United States v. Hughes*, No. 21-cr-106-TJK (both defendants pled guilty to 18 U.S.C. §§ 1512(c)(2) and 2).

The other four defendants Brown points to received *longer* sentences than he did. *See* Judgment at 3, *United States v. Gardner II*, No. 21-cr-622-APM (55 months); Judgment at 2, *United States v. Mazza*, No. 21-cr-736-JEB (60 months); Judgment at 2, *United States v. Palmer*, No. 21-cr-328-TSC (63 months); Judgment at 2, *United States v. Caldwell*, No. 21-cr-181-CKK (68 months). So even assuming they were more culpable than Brown, as he insists, *see* Brown Opening Br. 30–33, their sentences already reflect that difference. Plus each of these defendants also pled guilty. *See* Plea Agreement at 1, *United States v. Gardner II*, No. 21-cr-622-APM; Plea Agreement at 1, *United States v. Mazza*, No. 21-cr-736-JEB;

Plea Agreement at 1, *United States v. Palmer*, No. 21-cr-328-TSC; Plea Agreement at 1, *United States v. Caldwell*, No. 21-cr-181-CKK. So they are not similarly situated to Brown to begin with. *See Webster*, 102 F.4th at 490.

In short, "there are material differences between [Brown's] situation and the January 6th [defendants] who received lesser sentences." *Alford*, 89 F.4th at 954.

Third, even if some disparity existed, the district court's sentencing determination would still be substantively reasonable so long as the district court properly accounted for and balanced the Section 3553(a) factors. A sentencing disparity "is only one factor among many that district courts must balance when sentencing." *Alford*, 89 F.4th at 954. Courts must also "consider, for example, the circumstances of the offense, the characteristics of the defendant, the seriousness of the offense, the need for deterrence and the protection of the public." *Id.* (citing 18 U.S.C. § 3553(a)).

In this case, the district court fairly considered and balanced the Section 3553 factors. To start, the court "weighed several in [Brown's] favor," *Alford*, 89 F.4th at 955, crediting positive accounts of his character, his lack of criminal history, and his conduct while detained pre-trial, and noting that it was "laudable" that he "worked and served others" during that time, J.A. 2679–2680, 2691. The court also acknowledged that Brown did not have "any kind of gear that would suggest he was readying himself for potential aggression" on January 6th and did not "go on social media after the fact to crow about his actions * * * or suggest that they were justified in some way." J.A. 2682.

On the other side of the scale, the district court found that Brown fired pepper spray at officers in the Tunnel, engaged in

a "heave-ho" that "resulted in injuries to officers, and a great deal of stress [and] anxiety," and more broadly participated "in disrupting the peaceful transfer of power in a way that brought about violence and injuries and, frankly, shame." J.A. 2681–2682, 2685. The record thus reflects that the district court carefully balanced the relevant factors and did not abuse its discretion.

## IV

For the foregoing reasons, we affirm Brown and Maly's convictions and Brown's sentence. We vacate Schwartz's conviction on Count Eight, and we hold that the district court erred in denying his suppression motion. We remand to the district court to decide whether that error was harmless as to any counts.

*So ordered.*